NO. 07-03-0096-CR

IN THE COURT OF APPEALS

FOR THE SEVENTH DISTRICT OF TEXAS

AT AMARILLO

PANEL D

MAY 10, 2004
_____

ALBERT CARDONA,

Appellant

v.

THE STATE OF TEXAS,

Appellee
_____

FROM THE 140TH DISTRICT COURT OF LUBBOCK COUNTY;

NO. 2000-433,643; HON. JIM BOB DARNELL, PRESIDING
_____

*Opinion*
_____

Before QUINN, REAVIS and CAMPBELL, JJ.

Appellant Albert Cardona appeals his conviction for manufacturing a controlled substance. His three issues involve the trial court's denial of his motion to suppress evidence obtained upon the execution of a search warrant. Purportedly, the warrant was not supported by probable cause since 1) the informant was not shown to be reliable, 2) the police investigation used to corroborate the informant's tip did not produce evidence of

an illegal act, and 3) the information given by the informant did not link his observations to an illegal act. We reverse the judgment of the trial court.

## Background

The search warrant in question was based on an affidavit executed by Deputy Antonio Menchaca. Through it, the police sought authority to search the premises of Cardona Machine Co., 3610 Ave. A. Allegedly, amphetamine, methamphetamine and paraphernalia to manufacture, distribute and sell those drugs were located at the site.

Within the affidavit, it was alleged that Menchaca and Bruce Lange (a drug enforcement agent) interviewed, on April 13, 2000, an unnamed source who provided the following information: 1) he spoke with a hispanic male named Albert Cardona and an anglo male named J.C. Arnold within the last 72 hours; 2) he had been in the building at 3610 Ave. A within the last 72 hours; 3) he had observed "a large container of anhydrous amonina [sic] placed on a two-wheel dolly hidden behind a machine press towards the rear of the building"; 4) he saw a large and small Igloo type cooler "in the Office area of the business," 5) one cooler "contained numerous baggies"; 6) he saw another cooler by the "Anhydrous amonina [sic]"; 7) he observed "at least one cardboard box" apparently containing psuedophed; 8) he saw a "thermos, approximately two quarts in size, in the Office area" which thermos "had writing on the exterior in permanent type ink which . . . appeared to be a formula of some type"; and 9) he saw a white canister which he thought contained starter fluid. Two days later, according to the affiant Menchaca, the source contacted Lange and said that Cardona and Arnold "[w]ere ready to cook," were in the process of "obtaining 'lithium batteries' and were then going to cook 'today.'" He also

2

described the clothing of Cardona and Arnold and the vehicle that "belonged to . . . Cardona."

In the affidavit, Menchaca also described how on April 15th, he and Lange established surveillance at the 3610 Ave. A location. Furthermore, while they were there for several hours they 1) saw someone they recognized (from the informant's description) to be Cardona, 2) saw a car matching the general description given by their tipster, 3) saw Cardona and Arnold "frequently coming to the large overhead bay type door and the wooden front door, looking around, looking up and down the street and re-entering the business" for approximately "one and a half hours," 4) heard a "loud bang" and saw Cardona "come to the window and front door and look out," 5) saw Arnold and Cardona leave the building carrying "similar looking black nylon type long rectangular bags with shoulder straps," 6) noted the bay door had been "secured" while the wooden door was being "secured" as the two suspects left, 7) saw the two suspects enter the car and drive away, 8) eventually approached the building (about an hour after Cardona and Arnold left) whereat Lange "detected the strong chemical odor emanating from the large overhead bay door," 9) noticed that the bay door was not completely closed and had a garden hose "extending from under" it, 10) witnessed Arnold and Cardona return to the site "still carrying the black nylon bags," enter the building, and open the bay door, 11) saw Cardona "frequently [come] to the door and look[] out, at one point standing in the doorway, reading a magazine," 12) saw Arnold step from the building wearing "white latex type gloves" carrying "a jar" appearing to "contain a milky white liquid substance with a clear layer above it with visible separation between the two," and 13) saw Arnold pour the contents of the jar onto the ground and watched the contents evaporate "leaving . . . a white in color residue."

3

What the white substance consisted of was not described.  What caused the "bang" they heard and whether it came from within or outside the building also went unmentioned.  Nor did they describe 1) what, if anything, they saw occurring within the building once the bay doors were opened, 2) the nature of the business conducted by a machine shop, or 3) how the actions of Arnold and Cardona differed, if any, from the normal operation of a machine shop.  Similarly unmentioned was whether they saw (while conducting their several hour surveillance) anhydrous ammonia, coolers, baggies, a thermos containing a formula, starter fluid, or a box containing psuedophed.  And, how any of those items, or the "bang," or the jar with milky white liquid, or the use by Arnold of latex gloves, or Cardona's reading a magazine in the doorway, or the carrying of black nylon bags by Cardona and Arnold related to the presence or manufacture of amphetamine, methamphetamine, or some other contraband also went utterly unmentioned in the affidavit.

As for the chemical odor Lange smelled, no one described what it likened to, whether the manufacture of methamphetamine or amphetamine released a peculiar odor, whether the odor encountered was akin to that, if any, emanated while manufacturing methamphetamine, or whether it differed from chemical odors normally encountered in the operation of a machine shop.  In short, whether the smell was somehow related to the manufacture of methamphetamine, or to solvents or items normally used in a machine shop, or to decaying food left in a trash can was unmentioned.  The affiant also failed to explain if any of the activity witnessed was unordinary for the operation of a machine shop or how it related to the manufacture of a controlled substance.

As for the statement by the tipster about the Cardona and Arnold being "ready to cook" or that they "were then going to cook 'today,'" it was made some two days after he

initially spoke with Lange and Menchaca. Moreover, nothing in the affidavit disclosed how the informant came to know that the suspects allegedly were about to cook. Whether he had visited Cardona Machine Co. or spoken with Arnold or Cardona and garnered the information from them or through observing their activity is unknown. Indeed, the affidavit even fails to state where the tipster told them the cooking was to occur, assuming *arguendo* that the tipster even mentioned a place. Similarly unsaid by the affiant is anything about the tipster confirming that the items seen two days earlier at Cardona Machine Co., 3610 Ave. A were still there or at least unlikely to have been moved.

Nonetheless, before closing, the affiant did say:

[The tipster] knows what Amphetamine/Methamphetamine looks like and is familiar with the appearance, packaging, handling, use, and method by which the named controlled substance is introduced into the human body. In addition the [tipster] is familiar with paraphernalia utilized in the manufacture of Amphetamine/methamphetamine.

Affiant believes the [tipster] to be credible and reliable, based on the above independently corroborated information, provided by the [tipster].

Yet, how the tipster came to have this knowledge, the extent of his knowledge, his prior interactions, if any, with amphetamine or methamphetamine or its manufacture, his prior relationship, if any, with Menchaca or Lange, or the reliability of any prior information given the officers by him goes unmentioned. So too does the affiant fail to explain whether the tipster informed him that the items or activity he purportedly saw in the machine shop were related, in any way, to the manufacture or presence of a controlled substance at the locale. Indeed, and as previously alluded to, the affiant himself also omits from the affidavit any statement that explains how the acts of Cardona or Arnold or the presence of any item

5

alluded to in the affidavit indicated, in any way, that drugs were present or being made at the site.

## *Applicable Law*

A search warrant may not issue unless sufficient facts are first presented upon which a magistrate may conclude that probable cause exists supporting its issuance. TEX. CODE CRIM. PROC. ANN. art. 18.01(b) (Vernon Supp. 2004). These facts must be contained in a "sworn affidavit" accompanying the application for the warrant, *id.,* and illustrate 1) that a specific offense has been committed, 2) that the specifically described property or items to be searched for or seized constitute evidence of that offense or evidence that a particular person committed the offense, and 3) that the property or items in question are located at or on the particular person, place or thing to be searched. *Id.* art. 18.01(c). Additionally, whether the facts in the affidavit are adequate to establish probable cause depends on the totality of the circumstances. *Ramos v. State,* 934 S.W.2d 358, 362-63 (Tex. Crim. App. 1996), *cert. denied,* 520 U.S. 1198, 117 S. Ct. 1556, 137 L.Ed.2d 704 (1997). And, they establish such cause when the totality of those circumstances justifies a conclusion that the object of the search is *probably* on the premises. *Id.* at 363; *Taylor v. State*, 54 S.W.3d 21, 24 (Tex. App.–Amarillo 2001, no pet).

Yet, one cannot forget that the totality of the circumstances to which we allude must appear in the affidavit. This is so because the four corners of the affidavit comprise the field upon which we work. *See Cates v. State*, 120 S.W.3d 352, 355 n.3 (Tex. Crim. App. 2003) (stating that when a challenge is made "as to whether a search warrant affidavit is legally sufficient to show probable cause, the trial court is limited to the 'four corners' of the affidavit"); *Jones v. State*, 833 S.W.2d 118, 123 (Tex. Crim. App. 1992), *cert. denied,* 507

6

U.S. 921, 113 S.Ct. 1285, 122 L.Ed.2d 678 (1993) (stating "[i]t is well settled that, in determining the sufficiency of an affidavit for an arrest or search warrant, a reviewing court is limited to the 'four corners of an affidavit'"). Furthermore, while we must read the affidavit in a common sense, realistic manner and recognize that the magistrate to whom the affidavit is tendered may draw reasonable inferences from its content, *Jones v. State*, 833 S.W.2d at 123-24; *Carrillo v. State,* 98 S.W.3d 789, 791 (Tex. App.--Amarillo 2003, pet. ref'd), no one can read into the document material information "that does not otherwise appear on its face." *Cassias v. State*, 719 S.W.2d 585, 590 (Tex. Crim. App. 1986). And, though the magistrate's decision is entitled to deference, *Carrillo v. State,* 98 S.W.3d at 791, we must nonetheless assure that the affidavit provided substantial basis for the conclusion reached. *See Cassias v. State*, 719 S.W.2d at 590. In other words, it must provide a substantial basis to support the magistrate's determination that there existed a "fair probability that contraband or evidence of a crime [would] be found" at the locale to be searched. *Carrillo v. State*, 98 S.W.3d at 791; *Taylor v. State*, 54 S.W.3d at 24.

With the foregoing said, we turn to the circumstances before us and address issue three first. Upon doing so, we also note the complete absence in the affidavit of any statement tying the activity of Cardona or Arnold to illegal or suspicious activity. The affiant merely describes what he and Lange saw and what the tipster told him. Yet, no one indicated that the acts were like those undertaken by individuals engaged in any type of criminal activity. Nor was the magistrate even told that what the affiant perceived was unordinary or unusual conduct by those operating a machine shop or business utilizing machinery or a "machine press." And, like many other things omitted by the affiant, no one explained the relationship between the anhydrous ammonia, psuedophed, baggies,

7

coolers, thermos, milky white substance poured from a jar, "bang," latex gloves, and black nylon bags to the presence of methamphetamine, amphetamine, their manufacture or to any other type of potential criminal activity. These omissions are pivotal for the affidavit must illustrate not only that a specific offense has been committed but also that the specifically described property or items to be searched for or seized constitute evidence of that offense or evidence that a particular person committed the offense. TEX. CODE CRIM. PROC. ANN. art. 18.01(b) (Vernon Supp. 2004). Here, this court, the trial court and the judge who issued the warrant were left to guess at the nexus, if any, between the matter described in the affidavit and criminal activity.

Nor can one reasonably infer that because the tipster purportedly knew what methamphetamine was and was familiar with the paraphernalia used in its manufacture then the items of and matter about which he informed Menchaca and Lange constituted such paraphernalia or criminal activity. A simple example proves the fallacy of such an inference. An informant coupling a description of his experience with the manufacture of methamphetamine to a statement that he not only saw ten pounds of flour in a case hidden in a corner, three quarts of milk in a thermos containing some script, five pounds of chocolate chips, two pounds of butter in a cooler, and a case of pecans placed behind a portable oven and but also heard certain individuals say there were about to cook hardly makes the ingredients for grandma's chocolate chip cookies the contents of methamphetamine. Without someone familiar with the process of manufacturing the drug stating that the items seen or conduct perceived were somehow related to that process, any attempt to conclude that the items and conduct seen must relate to the drug or its manufacture is conjecture.

8

Nor do we accept the State's postulation that the affidavit was sufficient because "it is common knowledge what items are most often utilized in the manufacture of methamphetamine." Common knowledge consists of matter "so well known to the community as to be beyond dispute." *Ritz Car Wash, Inc. v. Kastis*, 976 S.W.2d 812, 814 (Tex. App.–Houston [1st Dist.] 1998, pet. denied). The formula for or ingredients of methamphetamine and amphetamine or the process by which either is made hardly falls within that category, and we rue the day it does. That same may also be found on the internet, according to the State, does not somehow elevate it to that status either. Indeed, having to investigate the annals of electronic data to discover particular information itself suggests that the subjects being researched are far from common knowledge. Moreover, if the presence of information on the worldwide web were alone the test for labeling matter common knowledge, then most everything would be such for most anything can be found there if the researcher is sufficiently patient and persistent. Indeed, one can also find on the internet information about the Superstring Theory and the manner in which it resolves the mathematical incompatibility of the foundational pillars of quantum mechanics and the General Theory of Relativity. Yet, that is no reason to conclude that the Superstring Theory is now part of the everyday, incontestable knowledge of the community. So, mere presence on the internet is far from determinative of how well-known a particular subject is.

Nor can the specialized knowledge of a particular magistrate or affiant be imputed into the affidavit. Again, the rule of law prohibits us from perusing anything other than the four corners of the document. Any specialized information lying within the mind of a police officer or jurist and garnered through the years falls outside that realm. As said in *Cassias*,

9

"[i]t is one thing to draw reasonable inferences from information clearly set forth within the four corners of an affidavit . . . [and] quite another . . . to read material information into an affidavit that does not otherwise appear on its face." *Cassias v. State*, 719 S.W.2d at 590.

So too do we reject the State's suggestion on appeal that it "is a reasonable inference based upon the hidden location of the anhydrous ammonia within a machine shop that the . . . ammonia was illicitly acquired and was improperly stored in a receptacle not designed for the storage" of same.[1] Immediately noticeable is the absence of any explanation regarding how one can logically jump from the proposition that something is hidden to the conclusion that it must be contraband. Parents hide presents from their children; that does not mean the presents were obtained unlawfully or that the presents consist of contraband. Hiding something may permit one to infer that someone does not want the item to be easily found. Yet, it does not alone reasonably permit one to infer that the object being hidden is somehow tied to criminal activity. To surmise otherwise would be to again delve into conjecture, and that we cannot do.

Appellant's third issue is meritorious. Thus, we conclude that the affidavit did not provide substantial basis for the conclusion that a specific offense had been committed, and hold that the trial court erred in failing to grant the motion to suppress. So too do we find that the error was harmful since the evidence obtained upon execution of the defective warrant provided the basis for appellant's conviction. And, since appellant's other criticisms

---

[1]We assume *arguendo* that the ammonia was hidden. In doing so, we also note that Menchaca failed to explain how his tipster arrived at that conclusory observation. Also worthy of note is the line of authority holding that conclusions appearing in an affidavit carry little weight. *Cassias v. State*, 719 S.W.2d 585, 588 (Tex. Crim. App. 1986) (stating that conclusory utterances "establish little if anything").

of the affidavit need not be addressed at this time, we reverse the judgment and remand the cause to the trial court.

Brian Quinn
Justice

Publish.