PD-1470-15
COURT OF CRIMINAL APPEALS
AUSTIN, TEXAS
Transmitted 12/11/2015 8:48:48 AM
Accepted 12/11/2015 12:44:10 PM
ABEL ACOSTA
CLERK

NO. PD-1470-15

IN THE COURT OF CRIMINAL APPEALS

OF TEXAS

REBECCA VICTORIA HUMARAN, Appellant

VS.

THE STATE OF TEXAS, Appellee

On Petition for Discretionary Review from

The Fourteenth Court of Appeals

in No. 14-14-00421-CR Affirming

The 239th Criminal District Court of

Brazoria County, Texas, Cause No. 68647,

Honorable Patrick Sebesta, Judge Presiding

APPELLANT'S PETITION FOR DISCRETIONARY REVIEW

FILED IN
COURT OF CRIMINAL APPEALS

December 11, 2015

ABEL ACOSTA, CLERK

Oral Argument Waived

Crespin Michael Linton
440 Louisiana, Suite 900
Houston, Texas 77002
Texas Bar No. 12392850
(713) 236-1319
(713) 236-1242 (FAX)
crespin@hal-pc.org
Counsel for Appellant

# INDEX

PAGE

| | |
|---|---|
| Index | 2 |
| Names of All Parties | 3 |
| List of Authorities | 4 |
| Statement Regarding Oral Argument | 6 |
| Statement of the Case | 6 |
| Procedural History | 6 |
| GROUND FOR REVIEW | 7 |

THE COURT OF APPEALS ERRED IN AFFIRMING THE TRIAL COURT'S REFUSAL TO GIVE JURY INSTRUCTIONS ON NECESSITY AND DURESS

| | |
|---|---|
| Reason for Review | 7 |
| Statement of Facts | 8 |
| Arguments and Authorities | 9 |
| Prayer for Relief | 13 |
| Certificate of Compliance | 13 |
| Certificate of Service | 13 |
| Appendix A | 14 |
| Opinion, *Humaran v. State* | |

2

# NAMES OF ALL PARTIES

Pursuant to Tex. R. App. P. 38.1(a), the following are interested parties:

Presiding Judge:                              Patrick Sebesta
239th Criminal District Court
111 E. Locust, 3rd Floor
Angleton, Texas 77515

Appellant:                                     Ms. Rebecca Victoria Humaran
Texas Department of Criminal Justice
TDCJID# 01928663
Crain Unit
1401 State School Road
Gatesville, Texas 76599

Attorneys for State:                    Mr. Trey Picard
Brazoria County District Attorney's Office
111 E. Locust, 4th Floor
Angleton, Texas 77515

Attorneys for Appellant:              Mr. Juan L. Guerra, Jr. (trial)
4101 Washington Avenue
Houston, Texas 77007

Mr. Crespin Michael Linton (appeal)
440 Louisiana Street, Suite 900
Houston, Texas 77002

# LIST OF AUTHORITIES

CASES                                                                    PAGE

**Bufkin v. State**, 27 S.W.3d 779, 782.....................     10
(Tex. Crim. App. 2013)


**Gomez v. State**, 380 S.W.3d 830, 834.....................     11
(Tex. Crim. App. 2013)


**Juarez v. State**, 308 S.W.3d 398, 399.....................     10
(Tex. Crim. App. 2013)


**Krajcovic v. State**, 393 S.W.3d 282, 286..................     10
(Tex. Crim. App. 2013)


**Shaw v. State**, 243 S.W.3d 647, 657.......................     10
(Tex. Crim. App. 2007)


STATUTES

TEX. Pen. Code Section 8.05(a) (West 2014).................     10

Tᴇx. Pen. Code Section 9.22 (West 2014) ...................... 11

## RULES

Tᴇx. R. App. Proc., Rule
38.1(a)............................................................ 3

## STATEMENT REGARDING ORAL ARGUMENT

Pursuant to Rule 39.1, Appellant waives the right to oral argument.

## STATEMENT OF THE CASE

The Appellant was charged with Murder. After a jury trial, the jury found Appellant guilty of Murder and sentenced her to a term of 50 years in prison.

## PROCEDURAL HISTORY

All points of error were affirmed by the Fourteenth Court of Appeals on October 15, 2015, in a published opinion. No motion for rehearing was filed.

## GROUND FOR REVIEW

THE COURT OF APPEALS ERRED IN AFFIRMING THE TRIAL COUT'S REFUSAL TO GIVE JURY INSTRUCTIONS ON NECESSITY AND DURESS.

## REASON FOR REVIEW

THE COURT OF APPEALS HAS DEPARTED SO FAR FROM THE ACCEPTED AND USUAL COURSE OF JUDICIAL PROCEEDINGS OR SO FAR SANCTIONED SUCH A DEPARTURE BY A LOWER COURT, AS TO CALL FOR AN EXERCISE OF THE COURT OF CRIMINAL APPEAL'S POWER OF SUPERVISION.

## STATEMENT OF FACTS

At about 4:00 p.m. on July 31, 2012, Brazoria County Sheriff's Deputies responded to a frantic 9-1-1 call concerning the killing of Clinton Sutton, Sr. Appellant told officers that Clinton Sutton, Jr., killed his father with an AK-47 and then burned his body in a barrel. Appellant told officers that Clinton Sutton, Jr., had choked her and tried to rape her. Officers found the deceased's charred remains in a red 55 gallon drum. The medical examiner concluded that the deceased probably died from multiple gunshot wounds.

The jury found Appellant guilty of Murder and sentenced her to 50 years in prison.

8

# ARGUMENTS AND AUTHORITIES

## GROUND FOR REVIEW ONE

THE COURT OF APPEALS ERRED IN AFFIRMING THE TRIAL COURT'S REFUSAL TO GIVE JURY INSTRUCTIONS ON NECESSITY AND DURESS.

## REASON FOR REVIEW

THE COURT OF APPEALS HAS SO FAR DEPARTED FROM THE ACCEPTED AND USUAL COURSE OF JUDICIAL PROCEEDINGS OR SO FAR SANCTIONED SUCH A DEPARTURE BY A LOWER COURT, AS TO CALL FOR AN EXERCISE OF THE COURT OF CRIMINAL APPEAL'S POWER OF SUPERVISION.

9

## DISCUSSION

The Court of Appeals incorrectly affirmed the trial court's refusal to give jury instructions on the defensive issues of necessity and duress.

The trial court must give a requested instruction on every defensive issue that is raised by the evidence. **Krajcovic v. State**, 393 S.W.3d 282, 286 (Tex. Crim. App. 2013) A defensive issue is raised by the evidence if there is some evidence, regardless of its source, on each element of a defense that if believed by the jury would support a rational inference that the element is true. **Shaw v. State**, 243 S.W.3d 647, 657 (Tex. Crim. App. 2007) The appellate court views the evidence in the light most favorable to the defendant's requested submission instead of the usual rule of appellate deference to the trial court's ruling. **Bufkin v. State**, 27 S.W.3d 779, 782 (Tex. Crim. App. 2006)

The defense of duress applies when a defendant is engaged in the proscribed conduct because he was compelled to do so by threat of imminent death or serious bodily injury to himself. **Tex. Pen. Code Section 8.05(a) (West 2014)** Necessity is a confession and avoidance defense that excuses an actor's conduct. **Juarez v. State**, 308 S.W.3d 398, 399 (Tex. Crim. App.

10

2010) Section 9.22 of the Texas Penal Code provides that a jury may excuse a defendant who admits to the charge conduct if (1) the defendant reasonably believed that her conduct was immediately necessary to avoid imminent harm, (2) the desirability and urgency of avoiding the harm clearly outweighed the harm sought to be prevented by the law proscribing the conduct, and (3) a legislative purpose to exclude the justification does not otherwise plainly appear. Duress and necessity require that Appellant first admit to all the elements of the underlying offense and then claim that his commission of the offense was justified because of other facts. **Gomez v. State**, 380 S.W.3d 830, 834 (Tex. Crim. App. 2013).

The appellate court conceded that there was sufficient evidence that Appellant admitted to the underlying offense of Murder. However, the appellate court erred in its finding that there was no evidence that Appellant was confronted by imminent harm at the time of the shooting that would excuse her conduct as being immediately necessary. In point of fact, the following testimony from Deputies Beaver and West provide sufficient evidence of this imminent harm:

1. Deputy Beaver testified that Appellant told him that Clinton Sutton,

11

Jr., tried to kill her (R.R. Vol. 9 at 17-22)

2. Deputy Beaver testified that Appellant told him that Clinton Sutton, Jr., assaulted her. (R.R. Vol. 4 at 174)

3. Deputy Beaver testified that Appellant told him that Clinton Sutton, Jr., shot at her with a gun and choked her to the point of unconsciousness. (R.R. Vol. 9 at 87)

4. Deputy West testified that Appellant told him that Clinton Sutton, Jr., raped her. (R.R. Vol. 4 at 55)

Appellant contends that is more than just evidence of Clinton Sutton, Jr.'s possible rape and assault to Appellant, but also evidence that she shot the deceased to keep from getting raped. Although the appellate court may have believed that the Appellant's statements to these deputies were too weak to support the defensive issues of necessity and duress, Appellant contends that sufficient evidence for its support was presented when viewed in the light most favorable to the defense. Therefore, the Court of Appeals erred in determining that there was no evidence to support Appellant's contention that she shot the deceased because she faced imminent harm from Clinton Sutton, Jr.

12

## PRAYER FOR RELIEF

For the reasons stated, Appellant Humaran prays the Court to grant her Petition For Discretionary Review, and after considering the grounds for review, reverse the judgment of the court of appeals and grant the relief requested.

Respectfully submitted,
/s/ Crespin Michael Linton
Crespin Michael Linton
440 Louisiana, Suite 900
Houston, Texas 77002
Texas Bar No. 12392850
(713) 236-1319
(713) 236-1242 (Fax)

## CERTIFICATE OF COMPLIANCE

I hereby certify that Appellant's Brief, as calculated under Texas Appellate Rule of Appellate Procedure 9.4, contains 1,491 words as determined by the Word program used to prepare this document.

/s/ Crespin Michael Linton
Crespin Michael Linton

## CERTIFICATE OF SERVICE

I do hereby certify that on this the 11th day of December 2015, a true and correct copy of the foregoing Appellant's Brief was served by E-service in compliance with Local Rule 4 of the Court of Appeals or was served in compliance with Article 9.5 of the Rules of Appellate Procedure delivered to the Assistant District Attorney of Harris County, Texas, 111 E. Locust Street, 4th Floor Angleton, Texas 77515 at davidb@brazoria-county.com and the State Prosecuting Attorney, P.O. Box 12405 Austin, Texas 78711 at information@spa.texas.gov.

/s/ Crespin Michael Linton
Crespin Michael Linton

# APPENDIX A

Opinion In the Court of Appeals

For The Fourteenth District of Texas

No. 14-14-00421-CR

*Rebecca Victoria Humaran,*
                              Appellant
                    v.

*State of Texas,*
                              Appellee

Affirmed and Opinion filed October 15, 2015.



In The

# Fourteenth Court of Appeals

## NO. 14-14-00421-CR

### REBECCA VICTORIA HUMARAN, Appellant

### V.

### THE STATE OF TEXAS, Appellee

**On Appeal from the 239th District Court
Brazoria County, Texas
Trial Court Cause No. 68647**

## OPINION

Appellant raises eight issues in this appeal from a conviction for murder. We overrule each issue and affirm the trial court's judgment.

## BACKGROUND

Appellant and her boyfriend, Clint, were charged with the murder of Clint's father, Tony. The evidence established that Tony was shot two times: first in the torso with an assault rifle, and second in the head with a high-powered revolver. His body was then burned beyond recognition in a large metal drum.

Clint was separately tried and convicted in an earlier proceeding. He died in prison on the eve of appellant's trial from an apparent act of suicide.

During appellant's trial, the State and the defense were both in agreement that Clint had fired the fatal shot into Tony's head. The two sides disagreed, however, about appellant's involvement in the murder. The State contended that appellant fired the first shot into Tony's torso, but the defense contended that Clint was solely responsible for each of the two gunshots. The defense asserted that appellant was merely present at the scene, while the State argued that appellant participated in the killing so that she, or her unborn child with Clint, could make a claim to Tony's estate.

The murder took place at Tony's home in a rural part of Brazoria County. The home was described as a metal shop, which functioned as a combined living quarters and mechanical garage. At the time of his death, Tony had been living there with just Clint and appellant.

Clint's mother, Samantha, and her boyfriend, Brent, drove to Tony's home at around 8:00 a.m. on the day of the murder. The great weight of the evidence suggested that Tony was already dead by that time. When they arrived, Samantha and Brent saw Clint and appellant standing outside on a concrete slab, dressed only in their underwear. There was a massive fire in the yard, and it was billowing smoke so dark that it blocked the clouds.

2

Clint whispered into appellant's ear as Samantha and Brent parked their car. Appellant then immediately picked up a water hose and began to spray down an area of the concrete slab. Brent testified that there was blood in the runoff. He also testified that he could see standing water inside of the shop.

Samantha exited the vehicle and went inside the shop to look for Tony. Clint followed her, leaving appellant and Brent outside by themselves. In their moment together, appellant never expressed any fear to Brent or made an outcry that Clint had just killed his father. Brent actually described appellant's demeanor as "real happy, jovial."

When Samantha reappeared from the shop and began to search the grounds for Tony, Clint said that she and Brent should leave at once and come back in forty-five minutes. Samantha and Brent left as instructed, and they returned just after 9:00 a.m. At that time, Clint and appellant were inside the living quarters of the shop. The fire in the yard was still burning intensely and the floor of the shop was still saturated with water.

Samantha reentered the shop and quickly got into a loud argument with Clint, who was angry that she had returned at all. Samantha left the shop to holler for Tony outside. As Clint tried to direct Samantha back to her car, appellant emerged from the shop completely naked and screaming at the top of her lungs. Appellant demanded that Samantha and Brent get off of the property, which she claimed to be her own, even though she lacked record title.

Samantha and Brent left once more and drove to a relative's house, where Samantha called the sheriff's office to report a brush fire at Tony's address. A sheriff's deputy was dispatched to the scene shortly before 11:00 a.m. By then, the fire had been greatly reduced to just a smoldering patch of earth.

3

Appellant greeted the deputy outside by herself, this time fully clothed. When the deputy informed her that he was responding to a smoke complaint, appellant believed that the complaint must have been made by Samantha. Appellant told the deputy that Samantha was a drunk and that she had stopped by earlier to cause problems with Tony. Appellant said that Tony was presently unavailable because he and Clint had gone to the store. As before, appellant did not make an outcry or express any anxiety about the events that had previously transpired. Her demeanor was described as "extremely cool, calm, and collected."

Appellant explained to the deputy that she had started the fire to burn some old documents and records. The fire was almost out, and she invited the deputy to inspect it. The deputy declined, apparently convinced that the matter was under control.

Later that day, not long after 12:00 p.m., Tony's childhood friend, Ray, stopped by the shop, intending to work on a project with Tony. No one was outside the shop when he arrived, but Tony's van was parked out front. Ray decided to let himself inside.

When he entered the shop, Ray heard appellant on the phone, inquiring about the availability of an apartment. Clint was in the bedroom sleeping. Appellant got off the phone and explained to Ray that she and Clint had been burning trash outside. When Ray asked about Tony's whereabouts, appellant responded that he "took off walking last night." Ray did not believe appellant's answer because he knew that Tony suffered from several medical conditions that made walking difficult. Ray chose to wait at the shop, hoping that Tony might still return. During that wait, appellant never asked Ray for help or mentioned anything to him about the murder.

4

Appellant eventually woke up Clint and told him that Ray was looking for Tony. Clint repeated the same story to Ray that Tony had left on a walk.

As Ray and Clint talked about other things, appellant approached Clint and asked where she could find the keys to the van. According to Ray, appellant appeared to want to load up her things and move away with Clint.

Ray and Clint continued to talk outside until, without warning or provocation, appellant threw a kitchen plate at them from inside the shop. Clint went back inside and yelled at appellant to stop breaking things. A physical fight ensued. Appellant slapped Clint in the face, and then Clint put his hands around appellant's neck, choking her. Clint did not release appellant until Ray intervened. When she was let go, appellant taunted Clint again, saying, "Why don't you tell [Ray] what you did to your dad, that you shot your dad last night?"

Upon Clint's insistence, Ray left immediately, but he did not call the police. Ray returned to the property later that day, at around 3:00 p.m., but the shop was locked and not a sound could be heard from the inside.

At 4:00 p.m., appellant dialed 911 from her cellphone. She claimed that she had been knocked unconscious and then raped by Clint. She pleaded for help because she was completely naked and locked outside of the shop. Two and a half minutes into the call, she told the dispatcher that Clint had killed his father that morning and had set the body on fire.

During one part of the call, appellant appeared to make an admission of guilt. Fighting through tears, she said, "He's burning his father! His father's dead! He shot him in the head with a .40 and I shot him in the shoulder with an AK!"

Police arrived on scene and escorted appellant to the back of a patrol car, believing she was just a victim. As first responders were attending to her, Clint

5

walked out of the shop carrying a revolver wrapped in a t-shirt. He peacefully surrendered himself to the authorities.

Investigators searched the premises and discovered a second burn pile on the property. They also found charred human remains inside of a large metal drum, buried beneath a stack of tires. Scans of the remains detected shards of metal consistent with bullet fragments in the chest and skull area. With the use of dental records, investigators confirmed that the remains were left by Tony.

Inside the shop, investigators found numerous guns, enough to fill a "miniature armory." They also uncovered many blood stains, even though the floor had been thoroughly washed. Next to a shower, they found a pair of women's jeans stained with Tony's blood.

Investigators tested the hands of both Clint and appellant for the presence of gunshot residue. Clint's hands tested positive for one characteristic and five indicative gunshot residue particles, which strongly suggested that Clint had fired a weapon. Appellant's hands tested positive for just one indicative gunshot residue particle. Based on that finding, the State's firearms expert could not testify with reasonable scientific certainty that appellant had also fired a weapon. However, the expert acknowledged that the test results were consistent with the deposit and subsequent removal of characteristic gunshot residue particles.

Appellant did not testify during her trial, but she did give at least five differing, and sometimes contradictory, statements, which were all retold through the State's witnesses. According to one sheriff's deputy who questioned her at the scene, appellant claimed that she woke up completely naked and covered in a wet sheet. Appellant confronted Clint, believing that she had just been raped, and the two of them got into an argument. Appellant claimed that Tony intervened in the argument, and that was the reason for Clint shooting his father.

6

Appellant told the deputy that Clint shot Tony first in the chest. She then claimed that she took off her shirt—despite having previously asserted that she was naked—and used the shirt to apply pressure to the chest wound. Appellant then claimed that Clint came up from behind her and fired an additional round into Tony's head. Appellant told the story as if the shooting had happened recently, but the deputy did not see any blood or brain matter in appellant's hair or on her skin, even though she would have been very close to Tony at the time of the second shot.

A captain in the sheriff's department questioned appellant after she was examined by emergency medical personnel. Appellant told the captain that the murder had happened during the middle of the night. She explained that she and Clint had been arguing, and that Tony got upset because he had been trying to sleep. Appellant claimed that Clint responded to Tony by shooting him first in the back—rather than the chest, as she had told the deputy—and then in the head.

The captain transported appellant to the sheriff's office to give a more formal statement. During the commute, he asked appellant to explain the events a second time, which she did in greater detail, but also with some variation. Appellant repeated that the murder had happened late that night after she and Clint had been arguing. She said that Tony began to argue with Clint because Clint's hollering and stomping was preventing him from sleeping. In response to Tony's argument, Clint grabbed a .44 Magnum and shot Tony in the chest—instead of the back, as she had previously told the captain. Appellant said that she then rushed over to Tony, removed the shirt that she had been wearing, and applied it to the chest wound. Clint then finished Tony off with a shot to the head.

Once at the sheriff's office, appellant signed a written statement that departed in significant ways from her three earlier statements. Appellant wrote that

7

she and Clint had woken up early at 4:00 a.m. to refill some hog traps, to shoot some cans, and to start a trash fire. They eventually returned to bed, and after sleeping for a short while, appellant told Clint that she wanted to end her relationship with him. Clint got angry, stomped about, and threw things around the room, which woke up Tony. Clint and Tony yelled at each other, but their fight did not result in a shooting.

Appellant wrote that Samantha came to the shop later that morning, looking for Clint's half-brother—and not Tony. In this version of events, Tony was still alive when Samantha made her visit. Appellant claimed that Samantha called the sheriff's office after she left because the trash fire was burning out of control. By the time the sheriff's deputy had arrived at the property, however, the fire was no longer a matter of concern.

Appellant explained that she began to pack her belongings after the deputy left, which ignited another argument with Clint. During this argument, Tony threw a water bottle at Clint's bedroom door, apparently because he was still upset with the loud noise. Clint opened the door and said, "What the hell do you want, Dad?" Another argument followed. At one point, Clint said, "What if I killed you right now, Dad?" Tony responded, "I wouldn't give a fuck." Appellant claimed that Clint then grabbed his gun and shot Tony in the front left shoulder. Appellant did not specify which gun was used, but she repeated her earlier claim that she rushed to Tony's side to stop the bleeding before Clint fired a second time. According to appellant, all of these events and the subsequent burning of Tony's body happened before Ray arrived at the shop.

Another sheriff's deputy agreed to drive appellant back to the shop so that she could collect some clothes and other personal effects. The plan was for appellant to stay overnight at a friend's house. Along the way, appellant

8

spontaneously told the deputy, "I think I'm going to sell the place," referring to Tony's property, which she believed to be worth "about $500,000."

When appellant arrived at her friend's house, she gave yet another version of the events. In this version, appellant said that Clint and Tony had been arguing over a bathroom light that was left on—and not loud noise. Appellant also specifically told the friend that Clint shot Tony first with an AK-47 and second with a pistol—despite one earlier claim that both shots had been fired with a .44 Magnum.

## SUFFICIENCY OF THE EVIDENCE

In her first and second issues, appellant argues that the evidence is legally insufficient to support her conviction for murder. The trial court's charge authorized the conviction under both a principal and a party theory of liability. On appeal, we will uphold the jury's verdict if the evidence is sufficient under any one of these theories. *See Anderson v. State*, 416 S.W.3d 884, 889 (Tex. Crim. App. 2013).

When reviewing the legal sufficiency of the evidence, we examine all of the evidence in the light most favorable to the verdict and determine whether a rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *See Temple v. State*, 390 S.W.3d 341, 360 (Tex. Crim. App. 2013). The evidence is insufficient when the record contains no evidence, or merely a "modicum" of evidence, probative of an element of the offense. *See Garcia v. State*, 367 S.W.3d 683, 687 (Tex. Crim. App. 2012).

Although we consider everything presented at trial, we do not reevaluate the weight and credibility of the evidence or substitute our judgment for that of the fact finder. *See Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007).

Because the jury is the sole judge of the credibility of witnesses and of the weight given to their testimony, any conflicts or inconsistencies in the evidence are resolved in favor of the verdict. *See Wesbrook v. State*, 29 S.W.3d 103, 111 (Tex. Crim. App. 2000). Our review includes both properly and improperly admitted evidence. *See Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). We also consider both direct and circumstantial evidence, as well as any reasonable inferences that may be drawn from the evidence. *Id.* Circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt. *See Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007).

A person commits a murder when she intentionally or knowingly causes the death of another person, or when, while having the intent to cause serious bodily injury, she performs an act clearly dangerous to human life that results in another's death. *See* Tex. Penal Code § 19.02(b)(1)–(2). A person acts intentionally, or with intent, with respect to the nature or result of her conduct when it is her conscious objective or desire to engage in the conduct or cause the result. *Id.* § 6.03(a). A person acts knowingly, or with knowledge, with respect to a result of her conduct when she is aware that her conduct is reasonably certain to cause the result. *Id.* § 6.03(b).

In some circumstances, a person may be criminally responsible as a party to an offense for conduct committed by another. For instance, a person is criminally responsible as a party if, while acting with intent to promote or assist the commission of the offense, she solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense. *Id.* § 7.02(a)(2).

Evidence is sufficient to convict under the law of parties where the defendant is physically present at the commission of the offense and encourages its

10

commission by words or other agreement. *See Salinas v. State*, 163 S.W.3d 734, 739 (Tex. Crim. App. 2005). Party participation may be shown by events occurring before, during, and after the commission of the offense, and may be demonstrated by actions showing an understanding and common design to do the prohibited act. *Id.* at 739–40.

In this case, there is direct evidence that appellant participated in Tony's murder. The jury heard an unedited recording of appellant's 911 call, in which she admitted to the dispatcher that she shot Tony in the shoulder with an assault rifle. The jury also heard an enhanced recording of the same 911 call, which reduced the background noise but retained the audio of the conversation. Both recordings support the jury's verdict that appellant was at least a party to murder.

There is also circumstantial evidence in support of appellant's conviction. For instance, the jury saw video evidence collected from appellant's cellphone showing her shooting an assault rifle at Tony's property in the weeks preceding the murder. Appellant's familiarity with firearms demonstrates that she was capable of shooting Tony, as she admitted in her 911 call.

The jury also heard that Tony's blood was found on a pair of women's jeans next to the shower in Tony's home. Because appellant was the only woman living in the home at the time of the murder, the jury could have reasonably concluded that the jeans belonged to appellant and that the blood transferred to the jeans because appellant participated in the murder. That conclusion is further enforced by testimony that, after Tony's death, appellant was washing away blood from a concrete slab while dressed only in her underwear. The jury could have deduced that appellant removed the jeans from her person during her efforts to conceal evidence of the murder.

11

There is also evidence that, before her 911 call, appellant had at least three opportunities to report the murder to someone who could have rendered her aid, but she did not do so. Appellant was alone with Brent for a few moments after he and Samantha first arrived at the property, but appellant never mentioned anything to Brent about the murder. When Samantha and Brent returned later that day, appellant actually chased them away.

Appellant passed up her second opportunity when a sheriff's deputy came to the property to investigate a smoke complaint. During that visit, appellant lied to the deputy about Tony's well-being, falsely stating that Tony and Clint had gone to the store. Furthermore, even though appellant invited the deputy to inspect the burn pile in the yard, she withheld from the deputy that there was a second burn pile on the property that contained Tony's remains.

Appellant had her third opportunity to seek help when Ray first came to the shop, but again, she lied to Ray about Tony's whereabouts. The jury could have reasonably concluded that by failing to report the murder when she had the chance to do so, appellant was actually attempting to conceal evidence of her guilt. *See Guevara v. State*, 152 S.W.3d 45, 50 (Tex. Crim. App. 2004) ("Attempts to conceal incriminating evidence . . . are probative of wrongful conduct and are also circumstances of guilt.").

Finally, evidence was produced from which the jury could have reasonably concluded that appellant had a motive for killing Tony. The jury heard testimony that appellant was pregnant with Clint's child, and that she believed from her pregnancy that she had an interest in Tony's estate. Appellant referred to Tony's property as her own hours after the shooting, and later that same day, she mentioned to a sheriff's deputy that she planned to sell the property. When combined with the numerous inconsistent statements she gave to police, this

12

circumstantial evidence supports an inference that appellant shot Tony so that she might benefit from his estate. *See id.* (motive and inconsistent statements are also circumstances of guilt).

In her brief, appellant contends that the trial court's judgment should be reversed because the evidence in support of her conviction is "overwhelmingly outweigh[ed]" by other testimony indicating that Clint was solely responsible for Tony's murder. But in a legal sufficiency challenge, "we do not weigh the evidence in support of the conviction against any controverting evidence that may be in the record." *See Price v. State*, 456 S.W.3d 342, 349 (Tex. App.—Houston [14th Dist.] 2015, pet. ref'd). Rather, we view all of the evidence in the light most favorable to the verdict and determine whether a rational jury could have found all elements of the offense beyond a reasonable doubt. *Id.* For the reasons explained above, we conclude that the jury could have found beyond a reasonable doubt that appellant acted as a party to murder.

## MOTION TO SUPPRESS

Shortly after the murder, investigators obtained two separate search warrants. The first warrant authorized the collection of a sample of appellant's DNA, and the second authorized the collection of evidence stored on her cellphone. Appellant moved to suppress this evidence, claiming that the affidavits offered in support of each warrant failed to establish probable cause, but the trial court denied the motion. In her third issue, appellant contends that the trial court's ruling was erroneous.

When we review a trial court's determination of probable cause, our standard of review is highly deferential because of the constitutional preference for searches conducted by warrants. *See Bonds v. State*, 403 S.W.3d 867, 873 (Tex. Crim. App. 2013). The test is whether the trial court had a substantial basis for

13

concluding that the search would uncover evidence of wrongdoing. *Id.* Because the trial court's determination of probable cause is based only on the four corners of an affidavit, we must analyze the affidavit according to common sense, and not in a hyper-technical manner. *Id.* When in doubt, we must defer to all reasonable inferences that the trial court could have made. *Id.*

The affidavit must set forth sufficient facts to establish probable cause of each of the following: (1) that a specific offense has been committed; (2) that the specifically described property or items that are to be searched for or seized constitute evidence of that offense or evidence that a particular person committed that offense; and (3) that the property or items constituting evidence to be searched for or seized are located at or on the particular person, place, or thing to be searched. *See* Tex. Code Crim. Proc. art. 18.01(c).

Probable cause exists when, under the totality of the circumstances, there is a fair probability or substantial chance that contraband or evidence of a crime will be found at the specified location. *See Flores v. State*, 319 S.W.3d 697, 702 (Tex. Crim. App. 2010). This is a flexible and non-demanding standard. *See Rodriguez v. State*, 232 S.W.3d 55, 60 (Tex. Crim. App. 2007). We focus on the combined logical force of the facts averred in the affidavit, not on what other facts could or should have been included. *See State v. Duarte*, 389 S.W.3d 349, 345–55 (Tex. Crim. App. 2012).

Although there are two separate affidavits involved in this case, each affidavit contains an identical set of facts. The affiant testified that he was an investigator assigned to an ongoing death investigation at Tony's residence, where human remains were found. The affiant also identified appellant's disturbance call as the reason that sheriff's deputies were initially dispatched to the scene.

After describing the events of Clint's arrest, the affiant testified that Clint gave an interview that implicated appellant in the commission of an offense. Clint said in his interview that he shot his father in the head with a revolver, and that he and appellant placed the body in a barrel and set it on fire to destroy the evidence. Suspecting that appellant may be guilty of either murder or tampering with evidence, the affiant requested a sample of appellant's DNA so that it could be compared to DNA evidence collected from the revolver and from "numerous other items of evidence collected at the scene." The affiant also requested all incoming and outgoing call data, text messages, photographs or videos, and information from her cellphone that could pertain to the offense.

Appellant argues that the affidavits are insufficient because "virtually every sentence in the affidavits concerned" Clint's activities, rather than hers. Appellant essentially contends that the affidavits do not establish a nexus between the commission of an offense and her DNA or cellphone. *See* Tex. Code Crim. Proc. art. 18.01(c)(2).

Applying a common-sense reading to the affidavits, we conclude that there were sufficient facts from which the trial court could find probable cause that the items to be searched for or seized constituted evidence that appellant committed an offense. The affiant established that: (1) human remains were found in a barrel outside of Tony's residence; (2) Clint was interviewed as a suspect in the murder; (3) Clint admitted during his interview that he shot Tony in the head with a revolver; (4) Clint further admitted that he and appellant placed Tony's body in a barrel and set it on fire to destroy evidence of the murder; and (5) DNA was collected from the revolver and from "numerous other items of evidence collected at the scene." Under the totality of the circumstances, the trial court could have concluded that there was a fair probability that evidence relating to the murder or

15

the destruction of evidence would have been found in appellant's DNA. *See Ford v. State*, 444 S.W.3d 171, 193 (Tex. App.—San Antonio 2014, pet. granted) (holding that there was probable cause for the issuance of a warrant for the collection of the defendant's DNA where surveillance photos depicted a person consistent in appearance with the defendant at the scene of the murder, where the defendant and the complainant had a known prior relationship, and where DNA was recovered on a towel covering the complainant's head).

The trial court could have made the same conclusion with regards to appellant's cellphone. The affiant testified that he and other sheriff's deputies responded to a disturbance call made by appellant. The affiant also testified that he had obtained information that appellant and Clint had acted together in at least the destruction of evidence. The affidavit established probable cause that evidence relating to the commission of an offense would have been found on appellant's cellphone.

The trial court did not abuse its discretion by denying appellant's motion to suppress.

## MOTION FOR MISTRIAL

In her fourth issue, appellant contends that the State improperly commented on her failure to testify during its cross-examination of a punishment-phase witness. Appellant moved for a mistrial outside the presence of the jury, but the trial court denied her motion. Appellant now argues that the trial court's ruling is reversible.

We review a trial court's ruling on a motion for mistrial for an abuse of discretion. *See Ocon v. State*, 284 S.W.3d 880, 884 (Tex. Crim. App. 2009). A mistrial is a serious remedy, reserved for only extreme circumstances in which

prejudice is incurable. *See Hawkins v. State*, 135 S.W.3d 72, 77 (Tex. Crim. App. 2004). Whether a given error necessitates a mistrial must be determined by examining the particular facts of the case. *See Ladd v. State*, 3 S.W.3d 547, 567 (Tex. Crim. App. 1999). We will uphold the trial court's ruling if it falls within the zone of reasonable disagreement. *See Wead v. State*, 129 S.W.3d 126, 129 (Tex. Crim. App. 2004).

A comment about the defendant's failure to testify violates the defendant's constitutional privilege against self-incrimination. *See* U.S. Const. amend. V; Tex. Const. art. 1, § 10. When deciding whether such a comment has been made, the reviewing court must consider the offending language from the jury's standpoint, as well as the context in which it arose. *See Bustamante v. State*, 48 S.W.3d 761, 765 (Tex. Crim. App. 2001). A violation occurs only if the language clearly refers to the defendant's failure to testify. *Id.* It is not sufficient that the comment might be construed as an implied or indirect allusion. *Id.* The test is whether the language used was manifestly intended or was of such a character that the jury would necessarily and naturally take it as a comment on the defendant's failure to testify. *Id.*

The complained-of comments were made during the State's cross-examination of the defense's "mitigation expert." The expert was a retired probation officer who interviewed appellant several times, and who opined at trial that appellant should receive the minimum sentence provided by law. The expert based her opinion on appellant's family ties, her need to care for her child, and a belief that Clint was primarily, if not solely, responsible for Tony's murder.

On cross-examination, the State attempted to erode the bases for the expert's opinion with the following line of questioning:

17

Q. All right. And is it your testimony that [appellant] was not capable of committing this crime without [Clint]?

A. Yes.

Q. That's your testimony to this jury?

A. Yes.

Q. And what's that based on?

A. Well, part of it is the offense report and she—she cared about his father.

Q. According to her?

A. Yes.

Q. What, if anything, did she tell you about, I guess, wanting to sell Tony's property, the victim's property?

A. I know that's an allegation. She—we did not discuss that. I saw—

Q. You didn't discuss that?

A. I saw that in the offense report.

Q. But you didn't think that was pertinent to you-all's discussion?

A. No.

Q. Why?

A. Because, again, I'm focusing on her and I didn't go into the facts of the case.

Q. Well, I mean, fair—wouldn't it be fair to say that the jury has got to—they've got to assess punishment and the facts of this case kind of matter? Wouldn't that—

A. They've heard all of the facts of the case. They've heard all of the testimony.

Q. And so, it seems like your conversations with the defendant focus on everything but the crime.

DEFENSE: Your Honor, that's argumentative, Your Honor; and it's badgering the witness.

COURT: Rephrase it, please.

18

Q. Would it be fair to say that your involvement in this case and your conversations with her pretty much involve everything but the crime?

DEFENSE: That's been asked and answered over and over.

COURT: Sustained.

Q. Are you asking this jury to overlook the crime?

A. No. They've heard the testimony of the crime. What I'm saying is that my purpose is to try to explain to the jury a little bit about her and I interviewed her about her background. They've—they've heard more—well, they've heard the testimony. I haven't.

Q. Right. Fair to say, I mean, they are in a better position to assess it than you are certainly?

A. No.

Q. They're not?

A. Well, obviously, they are. They're the jury. But I'm just saying I am here to give them a better picture of her, not to go into the details of the offense.

Q. And that better picture is based on your three interviews only with her?

A. And her family.

Q. And her family. And when you say give the jury a better picture of her, what is—what's—what's the picture we're talking about?

A. Just—I can—I can read notes of—I can read her growing up, a summary that her mom helped me with if you want me to do that.

Q. Well, we can't do that because it's—it's not admissible in evidence. But fair to say that that's pretty one-sided?

A. Well, of course.

Q. Yeah.

STATE: I'll pass the witness.

19

Appellant argues that these questions amount to an improper comment on her failure to testify because they draw attention to the fact that appellant did not discuss the events of Tony's murder during her private interviews with the expert. We disagree for at least two reasons. First, there is no clear reference in any of these questions to appellant's failure to testify. Second, it is obvious from the context that the State was merely suggesting that the expert had not fully appreciated the evidence of appellant's culpability when the expert opined that appellant was deserving of a light sentence. The trial court did not abuse its discretion when it denied appellant's motion for mistrial.

## MOTION FOR CONTINUANCE

The parties were advised at the end of voir dire that Clint had suddenly died in prison and that the cause of his death was believed to be a suicide. Appellant promptly moved for a continuance the following morning to investigate the circumstances surrounding Clint's death. She sought a few days to determine specifically whether Clint had left a suicide note. The trial court denied the motion.

Appellant argues in her fifth issue that her motion should have been granted. To show reversible error, appellant must satisfy a two-prong test. *See Gonzales v. State*, 304 S.W.3d 838, 843 (Tex. Crim. App. 2010). First, she must show that "the case made for delay was so convincing that no reasonable trial judge could conclude that scheduling and other considerations as well as fairness to the State outweighed [her] interest in delay of the trial." *Id.* (citing George E. Dix & Robert O. Dawson, 42 Texas Practice: Criminal Practice and Procedure § 28.56 (2d ed. 2001)). Second, she must show that she was actually prejudiced by the denial of her motion. *Id.* This standard is met if appellant can establish "with considerable specificity [that she] was harmed by the absence of more preparation time than [she] actually had." *Id.* at 842.

20

We need not address the first prong of this test because appellant cannot show that she was actually prejudiced. All written materials and personal items from Clint's prison cell were made available to appellant for inspection. They were also admitted as exhibits for the court, but not the jury. The exhibits established that Clint was found hanging in his cell from a makeshift noose. There was no suicide note or anything else with exculpatory value to appellant's case.

Because appellant cannot show that she was harmed by the absence of additional preparation time than she actually had, we conclude that the trial court did not reversibly err by denying the motion for continuance. *See Burdick v. State*, No. 14-14-00573-CR, — S.W.3d —, 2015 WL 4898713, at *5 (Tex. App.— Houston [14th Dist.] Aug. 6, 2015, no pet.) (holding that there was no reversible error in the denial of a motion for continuance where additional evidence that had been sought, but not obtained until after trial, was not material to the defendant's case).

## JURY CHARGE

In her sixth issue, appellant argues that the trial court reversibly erred when it denied her requested instructions on the laws of necessity and duress. We review such questions under a two-step process, considering first whether the trial court erred by failing to give the instruction. *See Ngo v. State*, 175 S.W.3d 738, 743 (Tex. Crim. App. 2005). If the trial court did err, we analyze that error for harm under the procedural framework of *Almanza v. State*, 686 S.W.2d 157 (Tex. Crim. App. 1984).

The trial court must give a requested instruction on every defensive issue that is raised by the evidence. *See Krajcovic v. State*, 393 S.W.3d 282, 286 (Tex. Crim. App. 2013). A defensive issue is raised by the evidence if there is some evidence, regardless of its source, on each element of a defense that, if believed by

21

the jury, would support a rational inference that the element is true. *See Shaw v. State*, 243 S.W.3d 647, 657–58 (Tex. Crim. App. 2007).

When deciding whether a defensive issue has been raised by the evidence, a court must rely on its own judgment, formed in the light of its own common sense and experience, as to the limits of rational inference from the facts that have been proven. *Id.* at 658. The defendant is entitled to an instruction on a defense when there is legally sufficient evidence to raise the defense, regardless of whether the evidence supporting the defense is weak or contradicted, and even if the trial court is of the opinion that the evidence is not credible. *Id.* Whether the record contains such evidence is a question of law, which means that we do not apply the usual rule of appellate deference to the trial court's ruling. *Id.* "Quite the reverse, we view the evidence in the light most favorable to the defendant's requested submission." *Bufkin v. State*, 207 S.W.3d 779, 782 (Tex. Crim. App. 2006).

Necessity is a confession-and-avoidance defense that excuses an actor's conduct. *See Juarez v. State*, 308 S.W.3d 398, 399 (Tex. Crim. App. 2010). To be entitled to the defense, the defendant must first admit to the conduct of the charged offense. *Id.* The jury may then excuse that conduct if it determines that:

> (1) the defendant reasonably believed that her conduct was immediately necessary to avoid imminent harm;
>
> (2) the desirability and urgency of avoiding the harm clearly outweighed, according to ordinary standards of reasonableness, the harm sought to be prevented by the law proscribing the conduct; and
>
> (3) a legislative purpose to exclude the justification does not otherwise plainly appear.

*See* Tex. Penal Code § 9.22.

Even though appellant did not testify in this case, there is still legally sufficient evidence that she admitted to the conduct of the charged offense. In her

22

911 call, appellant explicitly said that she shot Tony in the shoulder with an assault rifle. The jury could have inferred from that statement that the shooting was either intentional or knowing. Thus, the threshold "admission" requirement for a necessity defense was met.

There is no evidence, however, of one of the essential elements of a necessity defense. For an "imminent harm" to occur, there must be an emergency situation that requires a split-second decision without time to consider the law. *See Schier v. State*, 60 S.W.3d 340, 343 (Tex. App.—Houston [14th Dist.] 2001, pet. ref'd). There is no evidence that appellant was confronted with this type of harm at the time of the shooting. Without such evidence, the jury would have no basis for excusing appellant's conduct as being immediately necessary. Accordingly, we hold that the trial court properly refused appellant's requested instruction on the necessity defense. *See Kenny v. State*, 292 S.W.3d 89, 101 (Tex. App.—Houston [14th Dist.] 2007, pet. ref'd).

The analysis is similar on the question of duress. To be entitled to an instruction on that defense, the defendant must have engaged in the proscribed conduct because she was compelled to do so by threat of imminent death or serious bodily injury. *See* Tex. Penal Code § 8.05(a). Appellant contends that she qualifies under this definition because there was evidence that Clint "had assaulted and possibly raped" her. We agree that there is evidence that would support a finding that an assault or rape had occurred, but there is no evidence that appellant shot Tony because she was compelled to do so by threat of being assaulted or raped.

Appellant also makes the bare assertion that Clint "forced her to participate in his father's murder and its subsequent cover up," but there is no evidence to support that claim either. Appellant mentioned to some witnesses that Clint had forced her to watch as he shot his father and disposed of the body. We are not

aware of any testimony—and appellant has cited to none—that Clint also forced appellant to shoot Tony herself. The trial court did not err by denying appellant's requested instruction on the law of duress. *See Murkledove v. State*, 437 S.W.3d 17, 26 (Tex. App.—Fort Worth 2014, pet. ref'd). .

## EXCLUSION OF EVIDENCE

In her seventh issue, appellant complains about the trial court's decision to exclude evidence of Clint's suicide during the punishment phase of her trial. The trial court excluded the same evidence during the guilt phase, but appellant does not take issue with that ruling.

In a non-capital felony trial, evidence is admissible during the punishment phase if "the court deems [it] relevant to sentencing." *See* Tex. Code Crim. Proc. art. 37.07, § 3(a)(1). Evidence is relevant to sentencing if it helps the factfinder decide what sentence is appropriate for a particular defendant given the facts of the case. *See Hayden v. State*, 296 S.W.3d 549, 552 (Tex. Crim. App. 2009). The trial court is afforded wide discretion when deciding what evidence to admit, and we will not disturb its ruling on appeal unless it falls outside the zone of reasonable disagreement. *Id.* at 553.

Appellant argues that evidence of the suicide is relevant as a mitigating circumstance because it shows that Clint took responsibility for the killing of his father. Even if we indulged the speculation required of that argument, its reasoning would be contrary to *Morris v. State*, 940 S.W.2d 610 (Tex. Crim. App. 1996). In that case, the Court of Criminal Appeals held that "evidence of a co-defendant's conviction and punishment is not included among the mitigating circumstances which a defendant has a right to present." *Id.* at 614. "Each defendant should be judged by [her] own conduct and participation and by [her] own circumstances." *Id.* (citing *Evans v. State*, 656 S.W.2d 65, 67 (Tex. Crim. App. 1983)). It follows

24

that whatever inference of culpability that can be made from Clint's suicide is not relevant to assessing appellant's separate culpability for her role in Tony's murder. *See Joubert v. State*, 235 S.W.3d 729, 734 (Tex. Crim. App. 2007) (per curiam) ("A co-defendant's conviction and punishment have no bearing on a defendant's own personal moral culpability."). The trial court did not abuse its discretion by excluding evidence of Clint's suicide during the punishment phase of appellant's trial.

## ENHANCED RECORDING

In her eighth and final issue, appellant complains about testimony relating to the enhanced recording of her 911 call. The enhanced recording was admitted into evidence over appellant's objection after being authenticated by an audio forensics expert from the Houston Police Department. The expert testified that he used off-the-shelf computer software purchased from a local electronics store to reduce certain background noises from appellant's original 911 call. The expert represented that, after these enhancements, the content of appellant's conversation was still true and accurate.

The expert testified that he has no formal training in the software, but that is because the software's manufacturer does not offer such training. The expert further explained that he has received formal training in another software program from a different manufacturer, and the settings in the two programs are "relatively universal." The expert said that he prefers the off-the-shelf software, he has been using it for more than ten years, and he has trained others on how to use it.

Appellant objected to the admission of the enhanced recording on the basis that the expert lacked formal training in the software used to perform the enhancements. The trial court overruled that objection and allowed the enhanced recording to be published to the jury.

25

The State paused the recording at several points during the tape and asked the expert to repeat what he heard from the recording. Appellant objected that the elicited testimony violated the best evidence rule and invaded the province of the jury. The trial court overruled these objections as well.

In her brief, appellant argues that the trial court erred by allowing the expert to testify about the contents of the enhanced recording. She contends that the expert's testimony was irrelevant because "his opinion about the content of the enhanced recording is no better than a lay person['s]." Appellant frames this argument in reference to Rule 702, but she does not specify which portions of the expert's testimony she believes were objectionable, or even prejudicial.

Assuming without deciding that the trial court should have excluded the expert's testimony, we must review the trial court's error using the harm standard for nonconstitutional error. *See Johnson v. State*, 967 S.W.2d 410, 417 (Tex. Crim. App. 1998); *Eggert v. State*, 395 S.W.3d 240, 244 (Tex. App.—San Antonio 2012, no pet.). Under this standard, error must be disregarded unless it affects a defendant's substantial rights. *See* Tex. R. App. P. 44.2(b). An error affects a defendant's substantial rights when the error has a substantial and injurious effect or influence on the jury's verdict. *See King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997). If the error had no or only a slight influence on the verdict, the error is harmless. *Id.*

We cannot perceive how the expert's testimony had any effect on the jury's verdict. Appellant has not identified a single instance in which the expert's testimony varied from the actual contents of the 911 call. Even if there were a variance, appellant elicited testimony from the expert that he was only called as a witness "to enhance the 911 call, not necessarily to determine what every single word is on this call." The expert agreed that "the jury can listen to it and they can

26

make their own assessment." Considering further that appellant does not contend that the enhanced recording is inaccurate, we hold that any error in allowing the expert to testify about the contents of that recording is harmless.

## CONCLUSION

The trial court's judgment is affirmed.

/s/    Tracy Christopher
Justice

Panel consists of Justices Christopher and Donovan and Visiting Judge Guiney.*
Publish — Tex. R. App. P. 47.2(b).

*The Honorable Kristin M. Guiney, Judge of the 179th District Court of Harris County, sitting by assignment pursuant to section 74.003(h) of the Texas Government Code.

27