**Majority, Concurring, and Dissenting Panel Opinions of August 10, 2017 Withdrawn; Reversed and Remanded and En Banc Majority and Dissenting Opinions filed August 31, 2018.**



In the

# Fourteenth Court of Appeals

## NO. 14-15-01005-CR
## NO. 14-15-01006-CR

**NATHAN RAY FOREMAN, Appellant**

**v.**

**THE STATE OF TEXAS, Appellee**

### On Appeal from the 177th District Court
### Harris County, Texas
### Trial Court Cause Nos. 1374837 & 1374838

# E N  B A N C  M A J O R I T Y  O P I N I O N

Appellant Nathan Ray Foreman challenges his conviction for aggravated robbery and aggravated kidnapping. Foreman argues in a single issue that the trial court should have granted his motion to suppress surveillance video evidence found on a computer hard drive pursuant to a search warrant because the warrant's supporting affidavit did not establish probable cause. Having granted appellant's

motion for reconsideration en banc, we conclude the affidavit was not sufficient to support a finding of probable cause. This court's panel plurality, concurring, and dissenting opinions filed August 10, 2017, are withdrawn, and our judgment of that date is vacated. We reverse the trial court's denial of appellant's motion to suppress and remand for a new trial consistent with this opinion.

## I.  BACKGROUND

On December 24, 2012, witnesses driving on the service road of Highway 290 observed complainants Moses Glekiah and Richard Merchant tumble from the rear of a van onto the road. Complainants were bound with zip ties and their mouths were taped shut with duct tape. Witnesses observed that complainants had been shot and were bleeding. One witness called 9-1-1. Police and paramedics arrived at the scene, and complainants were taken by ambulance to Ben Taub Hospital.

Both complainants were injured. Merchant was more seriously injured. In addition to gunshot wounds and injuries from falling out of a moving vehicle, Merchant's abdomen had been burned with an iron. Due to Merchant's injuries, officers could not initially interview him. However, officers were able to interview Glekiah at the hospital. Glekiah initially told Officers Arnold and Hufstedler that he went to an auto shop to work on some cars when he was robbed by several black males.

Glekiah had an outstanding arrest warrant[1] and was transferred to Houston Central Jail after his discharge from the hospital. After the transfer, Arnold and Hufstedler met with Glekiah at jail, and Arnold asked him to "Take to us [sic] where this happened." Glekiah accompanied the officers and directed them to a custom auto shop at 2501 Central Parkway, Dreams Auto Customs.

---

[1] Glekiah had been indicted for armed robbery in Georgia.

2

The officers researched the shop, looking for individuals tied to the business. They found Charese Foreman listed as the owner of Dreams Auto Customs on a filing with the county clerk's office. Marriage license records showed Charese was married to Nathan Foreman. Arnold and Hufstedler concluded Nathan and Charese Foreman were both owners of Dreams Auto Customs.

Arnold subsequently obtained a search warrant for Dreams Auto Customs. Arnold was the affiant in the affidavit for the search warrant. In the affidavit for search warrant, Arnold described the facts as he understood them at that time: Glekiah and Merchant had agreed to meet someone at Dreams Auto Customs to conduct "business." When the two men arrived, several suspects grabbed them, tied them up, beat them, poured gasoline on them, and threatened to set them on fire. The suspects stole cash and other items from the men. The suspects then forced the men into the back of a van at gunpoint and drove the van away from the auto shop. The men jumped out of the moving van because they believed they were going to be killed. As the men jumped, they were shot by the suspects.

Arnold and Hufstedler executed the search warrant on January 8, 2013. At the shop, they found and seized three computer hard drives, zip ties, duct tape, a digital camera, a gas can, a computer skimmer, and an iron. They also swabbed for DNA. The computer hard drives were transferred to the police forensics lab, and forensic experts retrieved video surveillance from one of the hard drives. The video surveillance captured a portion of the offenses and appellant's involvement in the offenses.

In a pretrial motion to suppress, appellant objected to the seizure of the computer hard drives and/or video surveillance equipment. In support of the motion, appellant argued that the warrant did not list computers or computer hard drives as items to be seized. Appellant also argued that even if the computers were

characterized as "audio/video surveillance" or "video equipment" (items that were listed in the warrant), the supporting affidavit was defective because it failed to set forth sufficient facts to establish probable cause that surveillance equipment was located at the auto shop. Initially, the trial court denied the motion with regard to the computer containing surveillance video but suppressed the other two computers. Appellant then moved for rehearing of the motion to suppress and filed a second motion to suppress. Appellant asked the trial court to suppress "[a]ll computer hard drives and or audio / video surveillance video and or video equipment." On rehearing, the trial court ruled that none of the computers should be suppressed. Appellant moved to suppress a third time at trial. The trial court addressed the motion to suppress in a hearing outside the presence of the jury.

In the hearing, the State indicated it did not intend to introduce contents of the two computers which did not contain surveillance video so only the computer containing surveillance video was at issue. Arnold testified that he became aware of surveillance equipment at Dreams Auto Customs before drafting his affidavit, when he initially visited the shop with Glekiah. He testified that he mentioned video surveillance equipment in his affidavit "[b]ased on the cameras that we saw outside the business. If there's cameras, there's going to be a video surveillance system . . . . [T]he cameras outside told us that there was a system." Arnold reiterated, "Based on what we saw at that location when we drove by, we could see the video surveillance cameras mounted on the exterior. We surmised that there must be surveillance system on the inside as well possibly. So we included that in the search warrant." Arnold also testified it was "not unusual" and "probably expected" that a business like a custom auto shop would have a surveillance equipment system. When asked, "[I]s that something that you typically look for when investigating homicide cases?" Arnold responded, "Every time."

4

The affidavit included "audio/video surveillance video and/or video equipment" in a list of items Arnold believed might be found at the auto shop:

> I, D. Arnold, a peace officer employed by Houston Police Department do solemnly swear that I have reason to believe and do believe that on the property of 2501-C #2 Central Parkway Houston, Harris County, Texas (Target Location), with the authority to search for and to seize any and all ITEMS CONSITUTING [sic] EVIDENCE CONSTITUTING AGGRAVATED ASSAULT AND ROBBERY that may be found therein including, but not limited to all DNA and items that may contain biological material; fingerprints; hair fiber(s); audio/video surveillance video and/or video equipment; instrumentalities of the crime including firearm(s) and ballistics evidence; gasoline container(s), lighter(s), tap, zip tie(s), van; fruits of the crime including wallet(s), suitcase, briefcase, money, documents establishing identity of Complainant(s) and/or Suspect(s) such as paper(s), license(s), cell phone(s).

The affidavit also described the location:

> Said location of **2501-C #2 Central Parkway Houston, Harris County, Texas** is more particularly described as a single story building complex with a large sign facing Central Parkway that shows address 2501-C for all the businesses within the complex strip, this particular business [sic] is made of metal and brick with dark tinted glass windows and black painted aluminum; a sign attached to the front of the building over the door reads "Dreams Auto Customs"; the front door is dark tinted glass and faces parking lot; on the door is the suite number C#2; the back of the business has an aluminum looking, gray in color bay door that opens into the business.

Arnold admitted, however, that there was no reference to surveillance equipment in the section of the affidavit which stated the facts upon which his belief was based. The affidavit did not reference the officers' observation of cameras outside the business. The affidavit did not reference the officers' experience with surveillance equipment in custom auto shops or homicide cases. The facts section stated:

MY BELIEF IS BASED UPON THE FOLLOWING FACTS:

5

D. Arnold (Affiant) was assigned to investigate Aggravated Assault and reviewed offense report #161435712D written by Officer A. Deleon. Affiant was dispatched to 10500 Northwest Freeway, Houston, Harris County, Texas. Affiant learned from Officer A. Deleon that Cindy Davis (Witness) reported that on December 24, 2012 she observed two men (Complainants) lying injured on the side of the roadway with their hands tied and mouths duct taped. Affiant learned from HPD Officer A. Deleon that Complainants had apparent gunshot wounds to their bodies and had been transported to Ben Taub Hospital for treatment. Affiant spoke to Diane Deyoung who witnessed Complainants coming out of a white van license plate AV5-0784 before the [sic] continued down the road without stopping. Affiant learned from hospital personnel that Moses Glekiah (Complainant Glekiah) was recovering from gunshot wounds and Richard Merchant (Complainant Merchant) was in critical condition for his gunshot injuries.

Affiant spoke with Moses Glekiah (Complainant Glekiah) and learned he and his friend Richard Merchant (Complainant Merchant) had agreed to engage in [sic] business transaction at 2501-C #2 Central Parkway Houston, Harris County, Texas with a male known as "Jerry." When Complainants arrived on December 24, 2012 at the business that they describe as an autoshop, they are grabbed by several males and held against their will. Complainant Glekiah reported that Suspects also stole their cash money $400 that Complainants had in their possession, wallets, cell phone and a suitcase/briefcase container belonging to Complainant Merchant. Suspect 1 poured gasoline on Complainants and held lighter near Complainants threatening to set them on fire. Suspect 1 then called two other Suspects who put Complainants in truck at gunpoint. Complainant Glekiah says that he felt in fear for their lives. Complainants jumped out of the van because they believed they were going to be killed. As Complainant [sic] leaped out of the vehicle they were shot by Suspects.

Complainant Glekiah directed Affiant to autoshop where this Aggravated Assault and Robbery occurred at 2501-C #2 Central Parkway Houston, Harris County, Texas. Affiant researched the location and found the owner to be Charese Foreman. Affiant review computer databases and discovered that Charese Foreman is married to Nathan Ray Foreman. Affiant reviewed criminal history of Nathan Ray Foreman and found that he had been charged with autotheft, possession

6

of prohibited weapon and delivery of cocaine. Affiant showed Complainant Glekiah a known photograph of Nathan Ray Foreman along with five other photos of similar looking males. Complainant Glekiah positively identified Nathan Ray Foreman as Suspect 1 who participated in punching Complainants, told other suspects what to do, poured the gasoline on Complainants and contacted 2 suspects to drive Complainant away from business. Affiant knows that gasoline and lighter are deadly weapons that can kill a person.

Affiant believes that Complainants and Suspects DNA will be inside the Target Location along with property belonging to Complainant such as money, suitcase/briefcase, wallets, cell phone, identification cards. Also instrumentalities of the crime such as white van that transported Complainants, guns used to shoot Complainants, zip ties used to tie complainants may also be inside Target Location.

The trial court denied appellant's motion to suppress.

Trial resumed after the hearing, and the trial court admitted the surveillance video into evidence. The video was discussed by many witnesses and used to corroborate complainants' testimony. While there was independent evidence about complainants' rolling out of the van and the van being on fire,[2] the video was particularly significant in showing that appellant was involved in the robbery and the kidnapping. Other than complainants' testimony, the video was the only significant evidence showing appellant's involvement in the crimes, and evidence showed the credibility of complainants to be questionable.

Arnold testified that complainants had been running a black money scam[3] on appellant. Arnold testified Glekiah lied to him in his initial interview: "[P]ortions

---

[2] At trial, the first five witnesses testified to the scene out on the highway where the two complainants tumbled out of the van while tied up. The sixth witness testified about visiting the hospital to check on complainants' condition on the day of the incident. None of this testimony identified appellant as involved in any criminal activity. None of this testimony identified appellant as a driver or passenger in the van. None of this testimony even mentioned appellant.

[3] In a "black money" scam, a perpetrator defrauds an individual by persuading the individual that bundles of banknote-sized black paper are actually bundles of paper money that

7

of what he told us were not true." Arnold testified that Glekiah's second interview took place at jail because Glekiah was in custody for an outstanding warrant on an unrelated matter. Arnold testified that he ultimately believed Glekiah because "the actual explanation of why they were here came out" over time.[4]

Arnold also testified about the search warrant, the supporting affidavit, and the search. With regard to the computer hard drive containing the surveillance video, Arnold testified that when he executed the search, he observed that the hard drive appeared to be connected to a flat screen TV showing surveillance, and he "had reason to believe that was actually a surveillance system that was hopefully going to depict what video was collected in there."[5] Arnold testified that the video corroborated complainants' story about what had happened to them before the scene on the highway.[6]

When Hufstedler was on the stand, the State extensively played the video and elicited testimony about what it showed. The first person Hufstedler identified in the video was appellant. Hufstedler then repeatedly identified appellant in different parts of the video. In all, Hufstedler identified appellant in the video at least ten times. He testified that the video showed appellant walking in with duct tape in his

---

have been dyed black to avoid detection by authorities. Glekiah and Merchant represented to appellant that they would exchange smuggled dyed money for cash at a two-for-one rate and provide chemicals to remove the dye. On December 24, 2012, Glekiah and Merchant planned to exchange $200,000 in "black money" (construction paper) for $100,000 of appellant's cash.

[4] Arnold also testified regarding Glekiah's injuries. Arnold and Hufstedler testified that Glekiah identified appellant in a photo array.

[5] Hufstedler similarly testified, "When we entered the shop on the search warrant, when you walked into an office back in the shop itself where the cars were being worked on, if you see the monitor, it's actually just a large TV screen like you're looking at right now. It had surveillance cameras attached to it, and that monitor was then attached to this Dell computer."

[6] The next two witnesses explained how the video had been retrieved from the computer and saved to a file.

hand. Hufstedler also testified that the video showed that one of the men at the body shop, Darren Franklin, had a gun, and later, was walking with an iron in his hand.[7] Hufstedler explained that some of what occurred happened off camera. He testified that the video showed the van being parked inside the body shop. Hufstedler testified that the video showed appellant open the doors to the van and lay out a sheet or a blanket before pushing the two tied-up complainants into the back of the van and closing its doors. Hufstedler testified that, after considering the video, he conducted multiple interviews and filed aggravated kidnapping and aggravated robbery charges on appellant.

On cross-examination, defense counsel questioned Hufstedler about the absence of DNA and fingerprint evidence on the duct tape, zip ties, and other items that were seized from the auto shop. Defense counsel questioned Hufstedler about the identities of co-defendants, pointing out that there were a total of six co-defendants in the case. Hufstedler testified that complainants were initially reluctant to discuss all the facts with the police. Hufstedler acknowledged that complainants were trying to con appellant in a black money scam.

On re-direct, Hufstedler testified that the video showed appellant and a co-defendant loading bags complainants had brought to the shop into the rental car driven by complainants before another co-defendant drove the car out of the auto shop. Hufstedler testified the rental car was later discovered "burned." Hufstedler testified that the video and the zip ties and tape recovered at the shop corroborated

---

[7] That iron was seized in the search of the body shop and tagged into evidence. There was no DNA recovered.

what complainants told him.  Hufstedler also testified that complainants' injuries corroborated their stories.[8]

When Glekiah and Merchant testified, they admitted they had been running a scam on appellant.  Merchant admitted that he and Glekiah were using the scam to steal $100,000 from appellant.  Merchant admitted that he had run the same scam on a previous occasion.  Glekiah and Merchant admitted they were not entirely honest with the police during the investigation.  Glekiah testified that he had previously pled guilty to pandering and was under indictment for another offense in Georgia. Merchant testified that he had previously been convicted of family-violence battery in Georgia.  During their testimony about the events that took place in Dreams Auto Customs, the video was played both to corroborate their testimony and also to show what was missing from the video.

Recalled to the stand, Arnold testified on direct examination that the video showed appellant with a gun and that appellant was the one directing the other co-defendants to bring the van into the body shop.

In the State's closing argument, the State emphasized the importance of the video.  Although defense counsel had attempted to minimize the impact of the video by calling it a "silent movie" in its closing, the State disputed this characterization and repeatedly referenced the video as evidence of the alleged offenses.  The State argued that the video corroborated the testimony given during trial:

> You know that the testimony that you heard from this stand makes sense for a variety of reasons, not the least of which is the fact that what Defense counsel describes as a silent movie exists.  It's not just a silent movie, folks.  That is surveillance video footage that documents a

---

[8] The next witness was an arson investigator who responded to a vehicle fire and found the burned out rental car with the driver's licenses of the two complainants, fake money, a white powdery substance, some shoes, and a backpack.  The arson investigator testified that, based on his investigation, he determined the fire was incendiary, meaning someone had set the fire.

horrible, horrible crime that occurred here in your county back on Christmas Eve of 2012.

That's not nothing. That is exactly the type of evidence that you-all told me during voir dire that you wanted because you said, "Video, yeah, that would help me make my mind up. It would be great if you could see it."

Yeah, you might not be able to see everything on the video, but you see enough. You see the perpetration of a crime, and you see its horrific aftermath.

The State argued that the video evidenced the involvement of appellant in the alleged offenses:

There should be no doubt in your mind after having seen that video that Nathan Ray Foreman, that man, was the one driving the boat that day. It was his orders. It was his—it was his initial contact with our complainants that got this ball rolling. It was his orders that people come out with guns. It was his orders that they be bound, that they be gagged. It was his orders that they be burned. It was his orders that they be tossed into the back of a van to go someplace unknown to be shot and executed.

The State also argued that the video evidenced the "exhibiting a deadly weapon" element of aggravated robbery and aggravated kidnapping:

As for the exhibiting a deadly weapon, you know that there were deadly weapons used as part of the aggravated robbery in two ways. You know that there were—that there was a gun and/or guns, as the testimony as come out, used initially right after Richard Merchant brought in that construction paper and chemicals.

How do you know that there was a gun used? Well, first of all, you saw Darren Franklin walking in with a gun on video. So you know there was at least one gun. And testimony from Moses and Richard was that there were multiple guns there.

. . .

And, again, the deadly weapon, we talked about this before in aggravated—when we were discussing the elements of the aggravated robbery, that some of you could believe the gun was used initially as

11

they were binding and blindfolding Richard and, you know, while they had them down there on the ground. Some of you could believe that, and some of you could believe that the deadly weapon was actually used in the van.

The State argued that the video showed appellant's intent, using detailed references to the video in the form of a timeline:

Actions speak louder than words. We talked about this because you can infer somebody's intentions from your actions. The defendant has an absolute right not to testify. So that puts me in a place where how do I prove what his intent is?

You have to look at the contextual evidence surrounding it. Some of it you know. You heard testimony from Moses Glekiah that the defendant yelled out, "Guys come out," and people ran in with guns. So you can infer the defendant's intent from that. Absolutely. But you can also infer his intent by looking at his actions. The actions that he did over a four-hour period on December 24th of 2012.

So I want to look at it in terms of a timeline. First of all, at 9:54 a.m. on the surveillance video, Nathan Foreman puts an object consistent with a firearm in the back of his belt. That right there is evidence that he was in possession of a firearm.

At 9:54, also, you see Darren Franklin on the surveillance video putting a gun into his waistband.

Folks, if they were just there for a friendly business deal, why are we putting weapons, why are we getting all weaponed up two hours before the incident actually occurs?

At 11:25, Moses Glekiah and Richard Merchant arrived at Dreams Auto Customs.

At 11:30, Richard Merchant brings the money and the chemicals inside of the Dreams Auto Customs garage.

At 11:37, mere minutes after Richard Merchant has peacefully entered the location with his suitcase and the backpack full of the items used to scam the defendant, Darren Franklin and Jason Cunningham enter the garage with objects in their hands—you can see it on the video—that are consistent with firearms.

At 11:45, Nathan Ray Foreman retrieves duct tape and then walks off

12

camera with it to a location that is consistent to where the complainants are being held and tortured.

At noon, Nathan Ray Foreman is seen speaking on the phone, and then shortly thereafter Jason Washington, the Customs agent, enters in his uniform into the garage.

And you heard testimony that the agent then helped by looking at the GPS of the complainants and asking them where the money was.

Folks, that's what this is really about. Nathan Ray Foreman knew he was being scammed. He figured it out. He saw that black money.

. . .

Don't you know that he saw that that [sic] money inside of that suitcase wasn't real money? Don't you know that he realized that he got scammed and he was pretty mad? He was really mad. He thought this was going to be a huge windfall for him. And when he realized that he was being scammed, he wasn't smart enough to pick up on the fact that the money didn't really ever exist.

And that's what this is really about. These two men were bound and tortured and terrified and ultimately they were sent to their deaths because that man— . . . That man wanted money. That's what this is about.

At 1:00 p.m. Darren Franklin retrieves an iron, an iron that was identified by Moses and Richard as the iron that was used to torture a screaming Richard Merchant. You heard testimony from Moses about how terrified he was during that moment, how it hurt him to see his friend being hurt.

At 1:05, Charles Campbell wipes down the complainants' car. If these men, including Nathan Foreman, thought that they were in the right, if they weren't doing something that was terrible and wrong and illegal, there would be no need for them to try and wipe down and tamper with the evidence like what you see on the camera at 1:05 p.m.

. . .

And, finally, at 3:30 p.m., Nathan Ray Foreman places a blanket or tarp in the back of a van, a van where Moses Glekiah and Richard Merchant, without hope, believing that they were going to die that day, terrified, in pain, and alone, are loaded in.

And if what you see Nathan Foreman doing on this video isn't aiding,

13

assisting, encouraging and planning, I don't know what is. He is literally the person who was shutting the doors on the hope of our complaining witnesses.

The State referenced the video again in its final plea to the jury:

And so I'm asking each and every one of you to do something, not because it's fun, but because it's right and each and every one of you know it's right. You've seen the video. You've heard the testimony. There's only one decision for you to make, and that's to find Nathan Ray Foreman guilty of aggravated robbery and aggravated kidnapping.

At the conclusion of trial, the jury found appellant guilty of aggravated robbery and aggravated kidnapping. The trial court assessed 50-year sentences to run concurrently. When the trial judge announced appellant's sentence, she explained, "What I saw on the videotape that was offered into evidence is disturbing, to say the least. Because of the severity of the injuries and because of what I witnessed on the videotape, I assess your punishment at 50 years in the Texas Department of Criminal Justice Institutional Division in each case to run concurrently." Appellant timely appealed.

## II. ANALYSIS

In appellant's sole issue, he argues the trial court "erred in refusing to suppress the surveillance video evidence because the warrant affidavit failed to set forth facts sufficient to establish probable cause that surveillance video or surveillance equipment would be located at the place to be searched." Appellant argues that because the police officer's affidavit failed to establish probable cause, the officer's search for surveillance video or surveillance equipment violated the Fourth Amendment of the United States Constitution, article I, section 9, of the Texas Constitution, and chapter 18 of the Texas Code of Criminal Procedure.

### A. Standing

14

As a threshold matter, we address whether appellant had standing to challenge the lawfulness of the search. In order to challenge a search and seizure under the United States Constitution, the Texas Constitution or the Texas Code of Criminal Procedure, a party must first establish standing. *Pham v. State*, 324 S.W.3d 869, 874 (Tex. App.—Houston [14th Dist.] 2010, pet. ref'd) (citing *Villarreal v. State*, 935 S.W.2d 134, 138 (Tex. Crim. App. 1996)). The defendant who challenges the search has the burden to establish standing. *See State v. Betts*, 397 S.W.3d 198, 203 (Tex. Crim. App. 2013); *Villarreal*, 935 S.W.2d at 138.

Standing is a question of law that may be raised by this court *sua sponte*. *Kothe v. State*, 152 S.W.3d 54, 60 (Tex. Crim. App. 2004). A "reviewing court may properly sustain the trial court's denial [of a motion to suppress] on the ground that the evidence failed to establish standing as a matter of law, even though the record does not reflect that the issue was ever considered by the parties or the trial court." *Wilson v. State*, 692 S.W.2d 661, 671 (Tex. Crim. App. 1984) (op. on reh'g). However, the State may forfeit standing issues "through its assertions, concessions, and acquiescence in the course of litigation." *State v. Klima*, 934 S.W.2d 109, 110 n.1 (Tex. Crim. App. 1996); *see also Wilson*, 692 S.W.2d at 668 (citing *Steagald v. United States*, 101 S.Ct. 1642, 1646 (1981)). "Although we defer to the trial court's factual findings and view them in the light most favorable to [appellant], we review the legal issue of standing de novo." *Kothe*, 152 S.W.3d at 59.

A defendant may establish standing through an expectation of privacy approach or an intrusion-upon-property approach. *See State v. Bell*, 366 S.W.3d 712, 713 (Tex. Crim. App. 2012) (citing *United States v. Jones*, 132 S.Ct. 945, 949–50 (2012)); *Williams v. State*, 502 S.W.3d 254, 258 (Tex. App.—Houston [14th Dist.] 2016, pet. ref'd) (citing *Florida v. Jardines*, 133 S.Ct. 1409, 1414 (2013); *Jones*, 132 S.Ct. at 949–51; and *State v. Huse*, 491 S.W.3d 833, 839–40 (Tex. Crim.

App. 2016). The Court of Criminal Appeals has not yet addressed what legal standard should be applied in determining whether a defendant has standing to contest that a search was unreasonable under an intrusion-upon-property theory. *Williams*, 502 S.W.3d at 260. This court has analyzed standing under an intrusion-upon-property theory using the standard applicable to the reasonable-expectation-of-privacy theory.[9] *Id.* at 261. This court has alternatively analyzed standing using a narrower standard: "whether [a defendant] had a sufficient proprietary or possessory interest in the place or object searched." *Id.*

In this case, evidence offered by the State demonstrated that appellant had a sufficient proprietary or possessory interest in Dreams Auto Customs to have standing to challenge the search. Arnold testified that he researched Dreams Auto Customs as part of his investigation and determined that appellant and his wife, Charese, were owners of the business. Arnold testified that when he was unable to identify information involving the owner of the van, he "focused on the next available lead, which was researching the owners of the business, Nathan Foreman." The State introduced as evidence a filing with the county clerk's office listing Charese as the owner of the business. The State also introduced as evidence the Texas marriage license of Charese and appellant. In a community property state

---

[9] To demonstrate a legitimate expectation of privacy, a defendant must show: (1) he had a subjective expectation of privacy in the place invaded, and (2) that society is prepared to recognize that expectation as objectively reasonable. *Betts*, 397 S.W.3d at 203. In considering whether a defendant has demonstrated an objectively reasonable expectation of privacy, courts examine the totality of the circumstances surrounding the search, including: (1) whether the accused had a property or possessory interest in the place invaded; (2) whether he was legitimately in the place invaded; (3) whether he had complete dominion or control and the right to exclude others; (4) whether, before the intrusion, he took normal precautions customarily taken by those seeking privacy; (5) whether he put the place to some private use; and (6) whether his claim of privacy is consistent with historical notions of privacy. *Id.* at 203–04 (citing *Granados v. State*, 85 S.W.3d 217, 223 (Tex. Crim. App. 2002); and *Villarreal*, 935 S.W.2d at 138). This is a non-exhaustive list of factors, and no one factor is dispositive. *Id.* at 204 (citing *Granados*, 85 S.W.3d at 223).

such as Texas, a spouse is presumed to have an ownership interest in any business owned by his spouse during the marriage. Tex. Fam. Code Ann. § 3.003(a) (West 2018); *Marriage of O'Brien*, 436 S.W.3d 78, 85 (Tex. App.—Houston [14th Dist.] 2014, no pet.); *see also U.S. v. Ghali*, 317 F. Supp. 2d 708, 713 (N.D. Tex. 2004) ("Defendant's legal interest in the business arising from his marriage is sufficient to give Defendant standing under the Fourth Amendment to challenge searches of packages . . . ."). Hufstedler testified that a tote bag full of mail and papers was found in a storage room inside the auto shop, and that the mail was addressed to Nathan Foreman.

Evidence offered by the State also demonstrated that appellant had a sufficient proprietary or possessory interest in the computer to have standing to challenge the search. In the middle of trial, in a rehearing of appellant's motion to suppress outside the presence of the jury, Arnold testified that the computer systems belonged to Nathan Foreman:

> Appellant's trial counsel: Okay. There is reference [in the search warrant affidavit] to the computer databases being searched for Foreman's—Foreman's connection to Dreams Auto, correct?
>
> Officer Arnold: Yeah, they were Foreman's computer systems.

Under the narrower legal standard applicable to the intrusion-upon-property theory of standing, the State fulfilled appellant's burden to show that he had a sufficient proprietary or possessory interest in Dreams Auto Customs and the computer systems. *See Williams*, 502 S.W.3d at 261 ("[T]he standard would be whether the person had a sufficient proprietary or possessory interest in this place or object searched."); *Wilson*, 692 S.W.2d at 671 ("The prosecutor satisfied appellant's burden of producing evidence on the issue when he cross-examined appellant."). Consequently, we conclude that appellant has standing to challenge the search.

Even if this standard were not met, the State forfeited standing issues through

17

its "assertions, concessions, and acquiescence in the course of litigation." *See Wilson*, 692 S.W.2d at 668. As noted above, Arnold testified appellant was the owner of the business and the computer. In addition, the prosecutor conceded appellant was the owner of the auto shop in opening argument at trial, stating, "You'll hear testimony that Richard and Moses showed up at around 11:30 that morning to Dreams Custom Auto [sic], a body shop that's owned by Nathan Foreman." The State did not challenge or raise any fact issue concerning appellant's standing throughout the course of litigation. The State did not challenge appellant's standing at any of the three hearings on appellant's motion to suppress. The State did not argue that appellant was not the owner of Dreams Auto Customs or the computer at these hearings or at trial. There was no testimony or other evidence presented showing that appellant did not own the business or the computer. There is nothing in the record which makes it apparent that appellant did not have standing to contest the evidence. *Id.* Therefore, the State forfeited the issue through its "assertions, concessions, and acquiescence." *See id.*

Having concluded that appellant has standing to challenge the search, we consider his issue.

### B. Probable cause and reasonable inferences

We normally review a trial court's motion-to-suppress ruling under a bifurcated standard of review, under which we give almost total deference to the trial court's findings as to historical facts and review de novo the trial court's application of the law. *State v. McLain*, 337 S.W.3d 268, 271 (Tex. Crim. App. 2011). But, when the trial court determines probable cause to support the issuance of a search warrant, there are no credibility calls; rather, the trial court rules based on what falls within the four corners of the affidavit. *Id*. When reviewing a magistrate's decision to issue a warrant, appellate courts as well as trial courts apply a highly deferential

18

standard of review because of the constitutional preference for searches conducted under a warrant over warrantless searches. *Id*. As long as the magistrate had a substantial basis for concluding that probable cause existed, we will uphold the magistrate's probable-cause determination. *Id*. We are not to view the affidavit through hypertechnical lenses; instead, we must analyze the affidavit with common sense, recognizing that the magistrate may draw reasonable inferences from the facts and circumstances contained in the affidavit's four corners. *Id*. When in doubt, we defer to all reasonable inferences that the magistrate could have made. *Id*. at 272.

Appellant argues the trial court "erred in refusing to suppress the surveillance video evidence because the warrant affidavit failed to set forth facts sufficient to establish probable cause that surveillance video or surveillance equipment would be located at the place to be searched."

Article 18.02 of the Code of Criminal Procedure enumerates the types of items that may be searched for and seized pursuant to a search warrant. A video surveillance system falls under the general scope of article 18.02(a)(10): "property or items . . . constituting evidence of an offense or constituting evidence tending to show that a particular person committed an offense." *See* Tex. Code Crim. Proc. art. 18.02(a)(10) (West 2018).

Property subject to seizure under article 18.02(a)(10) is often referred to as "mere evidence." *Jennings v. State*, 531 S.W.3d 889, 893 (Tex. App.—Houston [14th Dist.] 2017, pet. ref'd). Mere evidence is evidence connected with a crime, but does not consist of fruits, instrumentalities, or contraband. *See id*. at 893 n.1. Accordingly, a warrant issued under article 18.02(a)(10) is known as an "evidentiary search warrant" or a "mere evidentiary search warrant." *Id*. at 893. Generally, to obtain a search warrant for "mere evidence" under article 18.02(a)(10), there must be a sworn affidavit setting forth sufficient facts to establish probable cause that (1)

19

a specific offense has been committed, (2) the specifically described property or items that are to be search for or seized constitute evidence of that offense or evidence that a particular person committed that offense, and (3) the property or items constituting evidence to be searched for or seized are located at or on the particular person, place, or thing to be searched. Tex. Code Crim. Proc. art. 18.01(c) (West 2018). However, "[i]f a warrant authorizes a search for both 'mere evidence' and items listed under another ground for search and seizure, the warrant is not a mere-evidentiary search warrant," and "the additional findings under (a)(10) are not required." *Jennings*, 531 S.W.3d at 893; *see Zarychta v. State*, 44 S.W.3d 155 (Tex. App.—Houston [14th Dist.] 2001, pet. ref'd).

The warrant in this case is not a "mere evidence" warrant because in addition to authorizing a search for evidence, it also authorized a search for the "instrumentalities of the crime including firearm(s) and ballistics evidence; gasoline container(s), lighter(s), tape, zip tie(s), van . . . ." As such, additional findings are not required under 18.02(a)(10). *See Jennings*, 531 S.W.3d at 893.

Nonetheless, the Fourth Amendment requires that a warrant affidavit establish probable cause to believe a particular item is at a particular location. *See id.* at 892. The core of the Fourth Amendment's warrant clause and article I, section 9, of the Texas Constitution is that a magistrate may not issue a search warrant without first finding probable cause that a particular item will be found in a particular location. *State v. Duarte*, 389 S.W.3d 349, 354 (Tex. Crim. App. 2012); *see* U.S. Const. amend. IV; Tex. Const. art. I, § 9. Under the Fourth Amendment, probable cause exists when, under the totality of the circumstances, there is a fair probability or substantial chance that contraband or evidence of a crime will be found at a specified location. *Bonds v. State*, 403 S.W.3d 867, 873 (Tex. Crim. App. 2013); *Rodriguez v. State*, 232 S.W.3d 55, 60 (Tex. Crim. App. 2007) (citing *Illinois v. Gates*, 462

20

U.S. 213, 238 (1983)); *Long v. State*, 525 S.W.3d 351, 366 (Tex. App.—Houston [14th Dist.] 2017, pet. ref'd) (citing *Gates*, 462 U.S. at 238). The facts stated in a search-warrant affidavit must be related so closely to the time of the warrant's issuance that a finding of probable cause is justified. *McLain*, 337 S.W.3d at 272.

This standard is "flexible and nondemanding." *Bonds*, 403 S.W.3d at 873; *Rodriguez*, 232 S.W.3d at 60. Because of the flexibility in this standard, neither federal nor Texas law defines *precisely* what degree of probability suffices to establish probable cause. *Rodriguez*, 232 S.W.3d at 61.

Probable cause must be found within the "four corners" of the affidavit supporting the search warrant affidavit. *McLain*, 337 S.W.3d at 271. Magistrates are permitted to draw reasonable inferences from the facts and circumstances contained within the four corners of the affidavit. *Davis v. State*, 202 S.W.3d 149, 154 (Tex. Crim. App. 2006). However, "[w]hen too many inferences must be drawn, the result is a tenuous rather than substantial basis for the issuance of a warrant." *Id.* at 157. Probability cannot be based on mere conclusory statements of an affiant's belief. *Rodriguez*, 232 S.W.3d at 61. A reviewing court's assessment of the affidavit's sufficiency is limited to "a reasonable reading" within the four corners of the affidavit while simultaneously recognizing the magistrate's discretion to draw reasonable inferences. *Duarte*, 389 S.W.3d at 354.

The Court of Criminal Appeals has held that inferences were reasonably made in several different contexts:

- **Instrumentalities of the crime.** In *Ramos v. State*, 934 S.W.2d 358, 363 (Tex. Crim. App. 1996), the Court explained that in a murder case, a magistrate could reasonably infer that a weapon could be found at the residence where the murder took place.

21

- **Possession of contraband.** In *Rodriguez*, 232 S.W.3d at 62–63, the Court held that a magistrate could reasonably infer that a garage contained drugs based on information that a man went to the garage, walked out with a package, threw the package in his car, and was later stopped with a package containing drugs. *See also Moreno v. State*, 415 S.W.3d 284, 288 (Tex. Crim. App. 2013) (involving similar inference based on information from confidential informant).

- **Skills and training.** In *Davis*, 202 S.W.3d at 155–57, the Court held that a magistrate could reasonably infer an officer was qualified to recognize the odor of methamphetamine, even though the affidavit was silent as to the officer's skills and training.

- **Time.** In *State v. Jordan*, 342 S.W.3d 565, 571 (Tex. Crim. App. 2011), a case involving a warrant to seize blood in connection with a suspected DWI, the officer did not indicate the precise time of his observations, but the Court held that a magistrate could reasonably infer that the officer's observations occurred on the same date that the offense was alleged to have occurred, and that this information was not stale because the affidavit was presented less than four hours after midnight. *See also Crider v. State*, 352 S.W.3d 704, 710–11 (Tex. Crim. App. 2011) (reaching different conclusion where window of time was much greater); *McLain*, 337 S.W.3d at 273 (holding that trial and appellate courts should have deferred to magistrate's implied finding that ambiguous phrase in affidavit referred to time that informant made his observations).

- **Credibility of an anonymous informant.** In *Flores v. State*, 319 S.W.3d 697, 703 (Tex. Crim. App. 2010), the Court held that a

magistrate could reasonably conclude an anonymous informant had some familiarity with the defendant based on corroborating evidence and the "doctrine of chances." *See also Duarte*, 389 S.W.3d at 359–60 (tip from first-time confidential informant was not reliable where there was no detail or corroboration).

- **Personal knowledge.** In *Jones v. State*, 568 S.W.2d 847, 855 (Tex. Crim. App. 1978), the Court held that a magistrate could reasonably infer that information conveyed in the passive voice was information within the personal knowledge of the affiant.

The parties have not cited, nor have we found, a case in which the Court of Criminal Appeals has determined under what circumstances a magistrate could reasonably infer that an electronic device exists in a particular location. This court has required specific facts to support an inference that those devices exist before we have allowed seizure or search of electronic devices pursuant to a warrant. This is demonstrated by our jurisprudence surrounding the searches of computers/cameras and cellphones.

Many of these cases address the second requirement of article 18.01(c), whether "the specifically described property or items that are to be searched for or seized constitute evidence of that offense or evidence that a particular person committed that offense," *see* Tex. Code Crim. Proc. art. 18.01(c), rather than whether a particular item will be found in a particular location. However, both considerations require that the property or items at issue exist. In this case, appellant's issue centers around whether probable cause existed that the surveillance video or surveillance equipment was located at the auto shop, not whether probable cause existed that the surveillance video or surveillance equipment constituted evidence of the charged offenses or evidence that appellant committed the offenses.

Nonetheless, the magistrate inferred not only that the surveillance video and surveillance equipment was at a specific location (inside of the auto shop); it also inferred that the surveillance video and surveillance equipment existed. Therefore, to the extent cases addressing the second requirement of article 18.01(c) involve inferences regarding the existence of property or items subject to search, we find them persuasive.

Generally, to support a search warrant for a computer, we have held there must be some evidence that a computer was directly involved in the crime. *See Ex parte Jones*, 473 S.W.3d 850, 856–57 (Tex. App.—Houston [14th Dist.] 2015, pet. ref'd) (defendant subscribed to commercial child pornography website); *Ryals v. State*, 470 S.W.3d 141, 143, 146 (Tex. App.—Houston [14th Dist.] 2015, pet. ref'd) (defendant told undercover officer that he would use computer to make fake IDs); *Porath v. State*, 148 S.W.3d 402, 409 (Tex. App.—Houston [14th Dist.] 2004, no pet.) (defendant met complainant in internet chat room).

When there is no evidence that a computer was directly involved in the crime, more is generally needed to justify a computer search. For example, in *Checo v. State*, 402 S.W.3d 440 (Tex. App.—Houston [14th Dist.] 2013, pet. ref'd), the defendant kidnapped a child and took her to a house, where he showed her adult pornography on a desktop computer. *Id.* at 444. The defendant then took the complainant to another room, where he attempted to assault her. *Id*. The complainant observed a laptop in that room that was set up to take pictures and videos. *Id*. The affiant obtained a warrant to search for child pornography (which the complainant had not been shown), and the defendant moved to suppress the results of the search, arguing that there was no information in the officer's affidavits that the defendant photographed or videotaped the complainant, or other information independently linking him to child pornography. *Id.* at 449. We rejected that

24

argument, noting affidavit testimony from the officer that those who engage children in a sexually explicit manner often collect child pornography on their computers. *Id*. Given this level of factual specificity, we held that the search warrant was valid. *Id.* at 449–50.

Another illustrative case is *Aguirre v. State*, 490 S.W.3d 102 (Tex. App.—Houston [14th Dist.] 2016, no pet.). There, a child complainant described how the defendant would photograph her while they had sex. *Id*. at 106–07. The complainant's mother stated that the defendant had a laptop that he did not allow anyone to use. *Id*. at 107. The police officer's affidavit testimony set forth that, based on her training and expertise, child molesters will often use their computers to store and exchange sexually explicit images of children. *Id.* We held that the affidavit was sufficient to support a search of the defendant's computer. *Id.* at 113–14.

Likewise, an affidavit offered in support of a warrant to search the contents of a cellphone must usually include facts that a cellphone was used during the crime or shortly before or after. In *Aguirre*, we also held that the affidavit was sufficient to search all of the defendant's cellphones where the complainant said that a particular cellphone was used to photograph her and that the defendant had used instant messenger to send her a photograph of his penis. *Id.* at 116–17. Based on opinion testimony included in the affidavit that pedophiles share pornography through electronic media, we concluded that all of the cellphones could be searched. *Id*.

In *Walker v. State*, 494 S.W.3d 905, 908–09 (Tex. App.—Houston [14th Dist.] 2016, pet. ref'd), we concluded that there was probable cause to search a defendant's cellphone when the affidavit stated that the defendant admitted to shooting the complainant, and there was other information that the defendant and the complainant

knew each other, communicated by cellphone, and exchanged messages and phone calls around the time of the shooting.

In *Humaran v. State*, 478 S.W.3d 887, 893–94 (Tex. App.—Houston [14th Dist.] 2015, pet. ref'd), the defendant made a "disturbance" call to police and there was evidence that she and a co-defendant had murdered a person and set the body on fire. We concluded that the facts were sufficient to support a search of her cellphone. *Id.* at 899–900.

With these general principles in mind, we turn to the affidavit in this case. We review the affidavit realistically and with common sense; "a reviewing court must uphold the magistrate's decision so long as the magistrate had a substantial basis for concluding that probable cause existed." *Duarte*, 389 S.W.3d at 354. Our focus cannot be on what other facts "could or should have been included in the affidavit," but rather must be "on the combined logical force of facts that actually are in the affidavit." *Id.* at 354–55. "The Supreme Court has repeatedly reminded reviewing courts that they should 'not invalidate the warrant by interpreting the affidavit in a hypertechnical, rather than a commonsense, manner.'" *Rodriguez*, 232 S.W.3d at 59. The allegations in the affidavit are sufficient if they would "justify a conclusion that the object of the search is probably on the premises." *Ramos*, 934 S.W.2d at 363 (quoting *Cassias v. State*, 719 S.W.2d 585, 587 (Tex. Crim. App. 1986)). We defer to all reasonable inferences that the magistrate could have made. *Duarte*, 389 S.W.3d at 354.

We conclude that the affidavit in this case failed to establish probable cause that surveillance video or surveillance equipment existed and would be located at Dreams Auto Customs. The affiant also provided no facts that a computer containing surveillance video was involved in the crime, directly or indirectly, such that the existence of surveillance video or surveillance equipment could be

26

reasonably inferred.[10]   The affidavit did not reference any computers or computer hard drives.   "[A]udio/video surveillance video and/or video equipment" was mentioned in the introductory paragraph of the affidavit, but no facts were described to support the conclusion that a video surveillance system existed at the body shop.[11] Nor were facts included from which it could reasonably be inferred that surveillance video or equipment would probably be found at the shop.[12]

The State argues that surveillance cameras are part of "everyday life," and as such, the magistrate could have reasonably inferred the existence of surveillance equipment in Dreams Auto Customs.   Courts have held that magistrates may rely on matters of common knowledge in finding probable cause.   *Rodriguez*, 232 S.W.3d at 64 ("As reviewing courts, we are obliged to defer to the magistrate and uphold his determination based upon all reasonable and commonsense inferences and conclusions that the affidavit facts support.").   For example, in *Manuel v. State*, the affiant did not need to describe special training or experience to support the conclusion that specific clothing worn by a murder suspect would probably be found at his residence, in part, because the court determined that it was common knowledge that the defendant's clothing would be at a defendant's home.   481 S.W.3d 278, 284–

---

[10] The State cites *Eubanks v. State*, 326 S.W.3d 231 (Tex. App.—Houston [1st Dist.] 2010, pet. ref'd), a child sexual assault case where the First Court of Appeals held that a magistrate could infer that a computer was used in a crime based on the child complainant's testimony that she was photographed.  We have not followed *Eubanks* for that proposition.  Nonetheless, compared to the instant case, even *Eubanks* contained more facts from which the magistrate could infer the existence of a computer.  In *Eubanks*, the affidavit recited the statement by the child complainant that she had been photographed, and the magistrate inferred that a computer was used to store the photographs.  *Id.* at 247–48.  In the instant case, the affidavit did not refer to any statement by complainants that the crimes against them had been videotaped.

[11] For example, the affidavit did not state that surveillance cameras were visible on the exterior of the body shop, nor did it state that cameras had been spotted inside the building.

[12] Arnold and Hufstedler testified that they observed cameras mounted on the exterior of the strip center where the auto shop was located; however, this observation was not included in the affidavit for the search warrant.

86 (Tex. App.—Houston [1st Dist.] 2015, pet ref'd) ("[C]ommon experience tells us that there is a 'fair probability' that clothing worn 'a lot' over a period of years will be kept at a person's residence.").

The State asserts that "[a]n Amazon search or a visit to Costco" will "reveal" that sophisticated surveillance systems are inexpensive. The State also offers a chart of Westlaw search hits for "security camera" or "surveillance camera" to demonstrate "[t]he ubiquity of surveillance cameras in ordinary life." But matters that are common knowledge (i.e., that a person takes his clothes off at home) do not need to be evidenced through Amazon searches or charts of Westlaw search hits. "Common knowledge consists of matter[s] 'so well known to the community as to be beyond dispute.'" *Cardona v. State*, 134 S.W.3d 854, 859 (Tex. App.—Amarillo 2004, pet. ref'd) (quoting *Ritz Car Wash, Inc. v. Kastis*, 976 S.W.2d 812, 814 (Tex. App.—Houston [1st Dist.] 1998, pet. denied)). The presence of surveillance video or equipment in an auto shop is not so well known to the community as to be beyond dispute.

Moreover, if a magistrate is permitted to infer that a video surveillance system was located in the auto body shop without any facts supporting the existence of that item, a magistrate could make those same inferences for a variety of items in any business.[13] This reasoning could lead to all computers and cellphones being searchable for any type of video or picture that could have recorded a crime, even though the affiant provided no facts suggesting that a computer or cellphone existed. Such an inference goes too far and is contrary to our cases requiring specific facts before a search warrant is issued.

---

[13] And, in this day and age, where a security system is cheaply available for personal use, a magistrate could make those same inferences for any home, too. Indeed, the State argues "that *people* and businesses are increasingly likely to have surveillance equipment" (emphasis added).

The State further argues that Dreams Auto Customs probably had a surveillance camera because it was an auto shop that "from time to time" may be burgled by its own customers. As the State explains, the shop "would ordinarily be in possession of its customers' property, with each piece of property worth thousands or tens of thousands of dollars." The State avers that "the way a mechanic shop ensures that it is paid for its work is to keep possession of cars until the customer pays" and an "owner might seek to surreptitiously recover it without the business's knowledge." None of this information was included in the affidavit. None of this information is "everyday life" knowledge. While it may be reasonable to infer that a custom auto shop contained expensive property, the additional inferences the State attributes to the magistrate are not common knowledge and cannot be reasonably inferred.

The affidavit contains no facts from which it can be inferred that customers of custom auto shops attempt to steal their own cars "from time to time." We cannot say that it is common knowledge or well known in the community that customers of custom auto shops attempt to steal their own cars "from time to time." The affidavit contains no facts from which it can be inferred that auto shops run surveillance to prevent customers from recovering their own vehicles. Common experience does not suggest that auto shops run surveillance to prevent customers from recovering their own vehicles. This is not a commonsense reading of the affidavit.

Courts allow magistrates to make reasonable inferences that often center on certain types of assumptions, but none of those assumptions has been the existence of a video surveillance system or surveillance video. None of the cases cited above or by the State supports the inferential leap the State asks us to make. Precedent from our own court with respect to computers and cellphones requires specific evidence that a computer or cellphone was present during the commission of the

29

crime, or that the facts of the type of crime itself lead to the conclusion that a computer or cellphone was connected to the crime. The State has not presented any reason, and we see no reason, why we should treat a case involving video surveillance systems and surveillance video differently.

The affidavit in this case did not establish any nexus between the criminal activity and the surveillance system. *Cf. Bonds*, 403 S.W.3d at 873. It cannot be reasonably inferred from the face of the affidavit that surveillance equipment would be found in the auto shop. *See Rodriguez*, 232 S.W.3d at 62. Consequently, the affiant provided insufficient facts to support finding probable cause that a video surveillance system was located at the body shop. *See Cassias*, 719 S.W.2d at 590 ("It is one thing to draw reasonable inferences from information clearly set forth within the four corners of an affidavit," but a reviewing court may not "read material information into an affidavit that does not otherwise appear on its face."). For this reason, and for the reasons discussed below, the trial court erred in denying appellant's motions to suppress.

**C. Plain view**

In further support of his argument that officers lacked probable cause to seize the computer hard drive containing video surveillance, appellant argues the plain-view doctrine does not apply. Although commonly classified as an exception to the warrant requirement, the plain-view doctrine is not truly an exception because the seizure of property in plain view involves no invasion of privacy and is presumptively reasonable. *Walter v. State*, 28 S.W.3d 538, 541 (Tex. Crim. App. 2000). If an item is in plain view, then neither its observation nor its seizure involves any invasion of privacy. *Id.* The rationale of the plain-view doctrine is that, if contraband is left in open view and is observed by a police officer from a lawful vantage point, there has been no invasion of a legitimate expectation of privacy and

30

thus no "search" within the meaning of the Fourth Amendment. *See Illinois v. Andreas*, 463 U.S. 765, 771 (1983).

A seizure of an object is lawful under the plain-view doctrine if three requirements are met. *Keehn v. State*, 279 S.W.3d 330, 334 (Tex. Crim. App. 2009). First, police officers must lawfully be where the object can be "plainly viewed." *Betts*, 397 S.W.3d at 206 (citing *Keehn*, 279 S.W.3d at 335). Second, the "incriminating character" of the object in plain view must be "immediately apparent" to the police officers. *Id.* Third, the officials must have the right to access the object. *Id.*

Appellant challenges only the second prong. This immediacy prong requires a showing of probable cause that the item discovered is incriminating evidence; actual knowledge of the incriminating evidence is not required. *Goonan v. State*, 334 S.W.3d 357, 361 (Tex. App.—Fort Worth 2011, no pet.) (citing *Joseph v. State*, 807 S.W.2d 303, 308 (Tex. Crim. App. 1991)); *see State v. Dobbs*, 323 S.W.3d 184, 185, 189 (Tex. Crim. App. 2010). Probable cause exists when the known facts and circumstances are sufficient to cause a reasonable person to believe that contraband or evidence of a crime will be found. *Wiede v. State*, 214 S.W.3d 17, 24 (Tex. Crim. App. 2007). Probable cause requires more than a hunch and must be supported by facts. *See id.* If an additional and unjustified search is required to develop probable cause, then the "incriminating character" of the object in plain view is not "immediately apparent." *See Dobbs*, 323 S.W.3d at 189. If an officer must manipulate, move, or inspect an object to determine whether it is associated with criminal activity, then the "incriminating character" of the object could not be said to be immediately apparent. *See Arizona v. Hicks*, 480 U.S. 321, 324–28 (1987).

Appellant analogizes the facts of this case to the facts of *Arizona v. Hicks*. In *Hicks*, police investigated a shooting at the defendant's apartment. 480 U.S. at 323.

31

In the process, they discovered stereo equipment that they suspected was stolen. *Id.* One officer recorded the serial numbers of the equipment, but had to move some of the equipment in order to do so. *Id.* The United States Supreme Court held that moving the stereo equipment to view the serial numbers constituted a warrantless search. *Id.* at 327–28.

The State contends that the plain-view exception does apply. The State points out that officers executing the warrant "observed an external hard drive connected to a monitor that was showing a live surveillance feed from six cameras throughout the garage." The State argues that "anyone seeing a device capable of recording and storing data connected to a surveillance system at a location where a crime occurred recently would have probable cause to believe the device would be evidence of a crime." The State emphasizes that the plain-view doctrine does not require certainty that an object is evidence, only probable cause. In support of its argument, the State summarizes *Arrick v. State*, 107 S.W.3d 710 (Tex. App.—Austin 2003, pet ref'd).

In *Arrick*, police believed that the defendant had killed a former girlfriend and disposed of her body. *Id.* at 719. Police obtained and executed a warrant to search the appellant's residence for, among other things, the victim's bloodstains. *Id.* at 716–17. The Third Court of Appeals explained that the magistrate who issued the warrant could have reasonably inferred (1) that the appellant got blood on his clothing when he shot the deceased and disposed of her body, and (2) that bloodstained clothing might be found at the appellant's residence. The following month, police conducted a second search of the appellant's residence with consent. During this search, officers seized two pairs of the appellant's shoes. The Third Court concluded the plain-view doctrine applied to the seizure of the shoes, explaining:

We have already held in our discussion of the search warrants that the

32

police had probable cause to believe that appellant fatally shot [his former girlfriend] and disposed of her body. They also had probable cause to believe that [her] blood might be found on appellant's clothing in [appellant's residence]. Because the police had probable cause to believe that [the deceased's] blood might be found on appellant's shoes, their value as evidence was immediately apparent.

*Id.* at 719. The State points out that this was "despite the fact that police did not see blood on the shoes . . . [or] conduct a blood test on the shoes until after they were seized." *Arrick* is distinguishable as it involved reasonable inferences applied to clothing.[14] It is common knowledge that shoes are worn like other clothing.

We conclude that, in this case, the "incriminating character" of the computer hard drive containing video surveillance was not "immediately apparent" under the plain-view doctrine because the State did not establish that, at the time of the seizure, sufficient facts and circumstances existed to warrant a person of reasonable prudence to believe the computer hard drive contained evidence. Nothing in the record suggests that the incriminating surveillance video was playing at the time the search warrant was executed. It did not become "immediately apparent" that the computer contained evidence of the crime until after further search of appellant's computer hard drive. The hard drive was taken to police forensics for inspection to determine whether it was associated with criminal activity.

The fact that the computer hard drive appeared to be connected to a surveillance screen in the shop where the offenses took place was not enough to formulate a probable cause determination. No other facts or circumstances linked the computer hard drive to the charged offenses. Trial testimony of the officers who executed the warrant, Arnold and Hufstedler, may have established that the officers

---

[14] Even if *Arrick* did present analogous facts, as an opinion of our sister court, *Arrick* is not controlling authority. *See Jankowiak v. Allstate Prop. & Cas. Ins. Co.*, 201 S.W.3d 200, 207–08 (Tex. App.—Houston [14th Dist.] 2006, no pet.).

believed the computer hard drive contained a surveillance system and surveillance video was stored on the computer hard drive. It did not establish they believed the video stored would probably evidence the offenses (which had taken place two weeks prior to the search).

At the first hearing on appellant's motion to suppress, Hufstedler testified on direct that his "assumption was that [the computer hard drive at issue] was attached to a surveillance system . . . . My assumption was that the [hard drive] was recording or at one time been used to record video in the location." At trial, Arnold testified that he had reason to believe the hard drive contained surveillance and he "hope[d]" the surveillance would constitute evidence: "we had reason to believe that [particular hard drive] was actually a surveillance system that was hopefully going to depict what video was collected in there."

The fact that officers seized two other computer hard drives even though they could not tell what those hard drives were being used for further undermines a probable cause determination. Appellant's counsel questioned Hufstedler about the seizure of the other two computers:

> Q. And then why did you seize 2 and 3? They weren't connected to any audio video information.
>
> A. I would not know whether they had audio video information on it, until it was seized and examined by the forensics lab.
>
> Q. Right. You had no information that there was any audio video information on any three of those hard drives, correct?
>
> A. I didn't know if the hard drive on the floor that was connected to the monitor was actually recording at that time, but my assumption [sic] that it was.
>
> Q. You're saying you assumed. But my specific question to you is that on the day you asked for this warrant you did not have information to believe that there were any hard drives with audio video information in this office.

34

A.      Well, there were cameras on the back of the building.  So we knew that there were cameras in the location.

. . .

Q.      So, it's not in your warrant.  So, in your warrant you didn't state that you had information about audio surveillance cameras, correct?

A.      We didn't know if those cameras were hooked up to that particular building.  It's a long strip center.

Q.      And the question is you didn't say anything about it?

A.      We didn't say anything about it.  No, sir.

Q.      Because you didn't know if it existed, correct?

A.      We weren't sure if it existed or not.

. . .

Q.      In fact, you didn't have any information about what was on there.  You previously stated you had no idea what was on them.

A.      Correct.

On re-direct, the State questioned Hufstedler broadly about whether he had a reasonable belief that there "might be" surveillance video on "any of" the hard drives, and Hufstedler responded that he and Arnold determined there "might be a possibility":

Q.      Officer Hufstedler, did you have a reasonable belief that there might be surveillance video on any of those hard drives?

A.      Yes.

Q.      What was that based on?

A.      Based on the fact there was a monitor when we walked in and we could see actual video of live feed of what was going on at the location.  There were cameras, obviously, there since we were seeing that, so we determined that there might be a possibility that video had been taken.

When the officers viewed the computer hard drives, they believed that the hard

35

drives contained a surveillance system. The officers also "assumed" that surveillance system "might" have recorded video at one time. None of the officers' testimony indicated that the officers believed the hard drive at issue would contain video surveillance from the time of the offenses or otherwise constitute evidence of the offenses.

Rather, this case is akin to *Nicholas v. State*, 502 S.W.2d 169 (Tex. Crim. App. 1973).[15] In *Nicholas*, police arrested the defendant in his home after being informed that he was wanted on a fugitive warrant in New Mexico. *Id.* at 170. In the defendant's home, the officers observed several photography negatives, which depicted the defendant having intercourse with an eleven-year-old girl. *Id.* at 171. The Texas Court of Criminal Appeals held that the negatives were not properly seized because the officers had to pick up the negatives and hold them to the light before being able to determine their incriminating character. *Id.* at 171–72. The Court explained, "the officers had, prior to examining the negatives, neither knowledge nor mere suspicion of an offense related to the film. What was in 'plain view' in the apartment was not evidence of any crime or criminal behavior." *Id.* at 172.

Because an additional and unjustified search was required to develop probable cause with respect to the computer hard drive at issue, the "incriminating character" of the hard drive was not "immediately apparent." *See Dobbs*, 323 S.W.3d at 185,

---

[15] *Nicholas* was decided before *Texas v. Brown*, 460 U.S. 730, 741–43 (1983), wherein a plurality of the United States Supreme Court reinterpreted the phrase "immediately apparent" to mean not an unduly high degree of certainty as to the incriminating character of the evidence, but rather probable cause to associate the property with criminal activity. However, *Nicholas* was also cited with approval by the Court of Criminal Appeals in *Joseph*, a case applying the reinterpreted plain-view standard. *See Joseph,* 807 S.W.2d at 309 (relying on *Nicholas* in support of its conclusion that officer had no probable cause to search contents of letter where search warrant authorized seizure of marijuana).

189.    Consequently, the plain-view doctrine did not apply to the seizure of appellant's computer.  We sustain appellant's sole issue on appeal.

### D. Harm analysis

We next consider whether the trial court's error is reversible.  Constitutional errors are reversible unless the appellate court determines the error did not contribute to the conviction or punishment beyond a reasonable doubt.  Tex. R. App. P. 44.2(a).  Non-constitutional errors are reversible if they affected a defendant's substantial rights.  Tex. R. App. P. 44.2(b).  Appellant contends the error violated the Fourth Amendment of the United States Constitution and article I, section 9, of the Texas Constitution, and therefore is constitutional error.  The State contends that this court should apply the non-constitutional error harm standard because, according to the State, the good-faith exception articulated in *United States v. Leon*, 468 U.S. 897 (1984), applies such that the admission of the surveillance video was not barred by the Fourth Amendment.[16]

We need not decide whether *Leon* applies in this case or whether its application requires this court to apply the less stringent harm standard.[17]  Even assuming that *Leon* applies and this required application of the harm standard for

---

[16] The State concedes that Texas's statutory exclusionary rule, Texas Code of Criminal Procedure article 38.23, requires exclusion where a warrant lacks probable cause.  Tex. Code Crim. Proc. Ann. art. 38.23(b) (West 2018).  Therefore, even if *Leon*'s good-faith exception applied, the video surveillance in this case should have been excluded pursuant to article 38.23 because the warrant was lacking probable cause with regard to surveillance.  The State argues that even if article 38.23 required exclusion, the application of *Leon* means this court should apply the harm standard for non-constitutional error rather than the standard for constitutional error.

[17] We note that the State does not address the alleged violation of the Texas Constitution.  In addition, the United States Supreme Court has indicated the *Leon* exception may not apply where, as here, the officer who executed the invalid warrant also prepared the warrant.  *Groh v. Ramirez*, 540 U.S. 551, 564 (2004) ("[B]ecause petitioner himself prepared the invalid warrant, he may not argue that he reasonably relied on the Magistrate's assurance that the warrant contained an adequate description of the things to be seized and was therefore valid.").

37

non-constitutional error, harm is established.

"A substantial right is affected when the error had a substantial and injurious effect or influence in determining the jury's verdict." *Thomas v. State*, 505 S.W.3d 916, 926 (Tex. Crim. App. 2016) (quoting *King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997)). An error had a substantial and injurious effect or influence if it substantially swayed the jury's judgment. In determining whether error had a substantial and injurious effect or influence on the verdict, we must review the error in relation to the entire proceeding. *Haley v. State*, 173 S.W.3d 510, 518 (Tex. Crim. App. 2005). "[I]f the appellate court, after examining the record as a whole, has fair assurance that the error did not influence the jury, or had but a slight effect," the error is harmless. *Johnson v. State*, 967 S.W.2d 410, 417 (Tex. Crim. App. 1998). If the appellate court is unsure whether the error affected the outcome, that court should treat the error as harmful. *Webb v State*, 36 S.W.3d 164, 183 (Tex. App.— Houston [14th Dist.] 2000, pet ref'd).

Given the record before us, we cannot say with fair assurance that the erroneous admission of the surveillance video did not affect appellant's substantial rights. The surveillance video was a central piece of evidence in the case. Other than information provided by complainants, admitted con artists, the video was the only strong evidence showing appellant's involvement in the offenses. Although the State presented other compelling evidence of the scene on the highway and of complainant's injuries, none of this evidence showed appellant's involvement in the aggravated robbery and aggravated kidnapping of complainants. The State relied primarily on the video in making its closing arguments. In addition, the trial court explicitly stated that the video evidence impacted appellant's sentencing. Under these circumstances, we must reverse the convictions.

We reverse appellant's convictions and remand the case for a new trial.

38

**III.      CONCLUSION**

The trial court erred in denying appellant's motion to suppress the surveillance video found on the computer hard drive seized from Dreams Auto Customs. Because this evidence strongly implicated appellant, we conclude that the trial court's error had a substantial and injurious effect or influence in determining the jury's verdicts and the trial court's sentences. We reverse the trial court's judgments and sentences and remand for further proceedings consistent with this opinion.


/s/     Marc W. Brown
Justice


En Banc Court consists of Chief Justice Frost and Justices Boyce, Christopher, Jamison, Busby, Donovan, Brown, Wise, and Jewell.

Chief Justice Frost and Justices Boyce, Christopher, Busby, Wise, and Jewell join the En Banc Majority Opinion authored by Justice Brown. Justice Jamison and Justice Donovan issue Dissenting Opinions.

Publish — Tex. R. App. P. 47.2(b).